**ARMOUR & CO. v. UNITED STATES.**

No. 48958.

United States Court of Claims.

March 4, 1952.

Arthur J. Phelan, Washington, D. C., for plaintiff.

John J. McGinty, Washington D. C., with whom was Asst. Atty. Gen. Holmes Baldridge, for defendant. Kendall M. Barnes, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

Plaintiff, Armour and Company, a meat packer, sues to recover $43,512.65 allegedly due it as the reasonable cost of icing approximately twenty-five hundred railroad refrigerator cars used in the shipment of various kinds of meat to the Government from December 1942 to June 1943.

The issue presented is whether or not the Office of Price Administration properly interpreted its regulations as requiring a disallowance of these charges.

Beginning in late September 1941 the Government began ordering meat from plaintiff on a carload lot basis. These purchase orders covered the cost only of the product and did not contain any provision for payment of the cost of pre-cooling and icing the refrigerator cars used to ship the meat. But it had been the long established practice that the total cost of initially icing and pre-cooling the refrigerator cars should be paid by the purchaser. This was in accord with the rules and regulations of the Chicago Board of Trade, in force from 1941 to date.

Since the purchase orders contained no provision for the payment for these services, plaintiff, just prior to October 1, 1941, arranged a conference with Colonel Madigan, the officer in charge of the Transportation Division of the Chicago Quartermaster Depot, to secure an agreement from defendant to pay these charges. Plaintiff stated that it possessed its own fleet of about 5,000 railroad refrigerator cars for use in shipping its meat products, and that they were specially equipped with a brine cooling system, consisting of brine retaining tanks surrounded on the outside with ice bunkers, and that it also possessed the facilities necessary to pre-cool and ice its cars. It stated that since under the prevailing practice the railroad companies were paid by the buyer for pre-cooling and icing the cars where the railroads performed this service, the packer also ought to be paid therefor when it performed this service.

As a result of this conference the parties reached an understanding that plaintiff should use its brine tank refrigerator cars wherever possible, and that it would be compensated for the pre-cooling and icing services it rendered. A flat price of fifteen dollars was agreed upon for pre-cooling and icing such a car. In the event that it was necessary to use a bunker type car, which was one without the brine tank feature, the understanding was that plaintiff should charge the Government for the ice and salt and labor used in the pre-cooling and icing, on the basis of the existing tariff rates established by the Interstate Commerce Commission. This was the same amount that the Government would have had to pay a railroad company in the event the railroad supplied the ice, salt, and labor necessary to pre-cool and ice a car.

On October 2, 1941 plaintiff sent a letter to the Quartermaster Corps in which it set forth the understanding reached at the above mentioned conference. This letter was not answered, but thereafter, from October 1, 1941 until December 1942 the plaintiff was paid for icing and pre-cooling all carload lot shipments.

However, on or about December 28, 1942, the Government returned to plaintiff a large number of icing charge invoices accompanied by a form letter stating that the Quartermaster Corps had been advised by the Office of Price Administration that when the products were sold f. o. b. the place of loading, the payment of initial icing charg-

es by the purchaser was not legal under the Revised Maximum Price Regulations, promulgated on November 2, 1942. Plaintiff immediately protested to the Quartermaster Corps, but without success. Thereafter, on January 10, 1943, plaintiff wrote to the Administrator of the Office of Price Administration requesting an official interpretation on whether icing charges could be collected under the Revised Maximum Price Regulation No. 148, governing the ceiling price on pork and pork products. On February 8, 1943, it received the following reply: " * * * As initial icing which is done by the seller is always accomplished before delivery to the carrier, any charge for such icing would necessarily have to be included within the maximum price."

Meanwhile, in late January 1943, plaintiff had filed petitions with the Office of Price Administration for amendment of certain ones of the applicable Revised Maximum Price Regulations to permit meat packers equipped to perform icing services to be compensated therefor over and above the ceiling price of the meat product itself. Subsequent petitions for amendments to similar regulations covering other meat products were filed through a period ending in June 1943.

As a result of these petitions and of inquiries from other packers who were equipped to furnish initial icing services, the Office of Price Administration, after study and investigation, came to the conclusion that an additional payment for icing charges should be permitted, since this had previously been a normal business practice. Consequently, Amendment No. 2 to Revised Maximum Price Regulation No. 148 was issued on March 6, 1943, effective, in the case of shipments of pork to War Procurement Agencies of the Government, as of March 1, 1943. This amendment provided that: "Payment by a buyer to a seller for icing services performed by the seller after March 1, 1943, and before delivery of dressed hogs or wholesale pork cuts to a railroad whose charges are paid directly to such railroad by the buyer shall not be construed as an evasion of such price limitations, if the charge for such icing services

is no higher than the cost actually incurred by the seller in performing such service and, in no event, higher than the charge which could lawfully have been made by the railroad if such services had been performed by the railroad."

The remaining applicable price regulations affecting other meat products were thereafter amended in like manner, the last ones becoming effective on June 13, 1943. Following the issuance of each amendment, the Quartermaster Corps resumed payments of the icing charges on the various meat products affected.

During the period that these petitions for relief from the foregoing interpretation of the price regulations were pending, and prior to the issuance of the amendments, plaintiff continued to submit separate invoices for icing charges to the Transportation Division of the Chicago Quartermaster Depot. Approximately 2,500 icing-charge invoices representing a total amount of $43,512.65 were submitted during the period in question, December 1942 to June 1943, but were returned unpaid.

However, during this period the Quartermaster Corps, with the permission of the Office of Price Administration, paid to other packers, who did not have their own refrigerator cars and the means for icing and pre-cooling them, the same ceiling price for their meat that plaintiff was paid, and also paid an additional amount to the railroad companies to cover the icing charges on refrigerator cars furnished by the railroads.

It is plaintiff's contention that the Revised Maximum Price Regulations were intended to preserve normal trade practices and, consequently, it says, that if these regulations had been properly interpreted by the Office of Price Administration, the collection of pre-cooling and icing charges, in addition to the ceiling price of the meat, by a packer performing this service would not have been in violation of the regulations, since this was a normal trade practice.

The defendant says, in reply, that under section 204 of the Emergency Price Control Act of 1942, 56 Stat. 23, 50 U.S.C.A. Appendix, § 901 et seq., this court cannot determine the validity and effect of the Office

of Price Administration's interpretation, but must, instead, accept it as binding, since only the Emergency Court of Appeals and the Supreme Court have jurisdiction to hear appeals from decisions of the Price Administrator involving the validity of any price regulation, order, or price schedule. But plaintiff says it does not attack the validity of the Revised Maximum Price Regulations, but says that the interpretation of them by the Office of Price Administration was improper, and it insists that this interpretation is not binding on this court.

The courts have strictly construed and enforced the provision for review of the validity of the orders of the Office of Price Administration; Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892; Lockerty v. Phillips, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339; but, in the instant case, we have before us, not the validity of the regulations, but the correctness of the agency's interpretation of them.

 The interpretation of a regulation or of a statute is a proper function of this or of any other court. This is not forbidden by the Emergency Price Control Act. That Act forbids any court other than the Emergency Court of Appeals to declare a price regulation invalid or to revise it, but it does not prohibit another court from determining what it means and, as a corollary, whether it has been properly applied. Mr. Justice Minton, then a judge on the Seventh Circuit Court of Appeals, said in Bowles v. Simon, 145 F.2d 334, 337:

"We do not accept the Administrator's view that he may promulgate a regulation and then place on it an interpretation which becomes controlling on the courts. The Administrator has not grown to any such stature. The courts may consider his interpretations and follow them, if correct, but the court is not bound to follow them. Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 325, 53 S.Ct. 350, 77 L.Ed. 796; Bowles v. Nu Way Laundry Company, 10 Cir., 144 F.2d 741.

"We think the District Court had a right to determine the meaning of these regulations for itself, although it could not, and did not, undertake to pass upon their valid-ity, since that authority resides in the Emergency Court of Appeals and in the Supreme Court. * * *"

 The revised regulations do not prohibit the payment of the icing charges in question. They fix a maximum price a packer could charge for his meat, but they do not say that if it actually rendered the purchaser some service in addition to furnishing him the meat, it could not make a reasonable charge therefor.

The defendant says this was prohibited by the evasion clause of the revised regulations. This clause reads: "Sec. 1364.26 *Evasion.* The price limitations set forth in this Revised Maximum Price Regulation No. 148 shall not be evaded, whether by direct or indirect methods, in connection with an offer, solicitation, agreement, sale, delivery, purchase, or receipt of, or relating to, dressed hogs or wholesale pork cuts alone or in conjunction with any other commodity, or by way of any commission, service, transportation, or other charge, or discount, premium or other privilege, or by tying-agreement or other trade understanding or by so curing wholesale pork cuts as to increase their cured weight beyond 110% of green weight, or by the sale of wholesale pork cuts not referred to in Appendix A (§ 1364.35) and not customarily sold by the same seller prior to March 23, 1942; Provided, * * *"

 This clause was evidently designed to prevent practices by which a packer could get for his meat more than the ceiling price, through the guise of a service charge and the other things mentioned. The clause had in mind a charge for a fictitious service. It did not prohibit a charge for a service actually rendered over and above the supplying of the meat.

The charges plaintiff made were for services actually rendered, and which had been customarily performed in the past at the purchaser's expense on shipments f. o. b. the place of loading. They were not charges for a new type of service begun after the advent of price controls, which might have been designed to effect an evasion of the price ceilings.

The prices fixed by the regulations were the packers' prices during the period of March 3 to March 7, 1942. During this period the packer, including the plaintiff herein, received these prices and, in addition, it received its charges for icing the cars.

The regulations were designed to maintain prices. After the regulations went into effect, the plaintiff received no more for its meat and for the icing than it had received before.

The original maximum price regulation No. 148 was in effect from May 21, 1942, to November 22, 1942. While it was in effect the packer was permitted to charge for icing services and it was paid for them. It was not thought that this was a violation of the evasion clause of that regulation. But, so far as material here, the evasion clause of this regulation and that of the revised regulation are identical.

One could not have permitted the charge and the other prohibited it.

After consideration of plaintiff's protest against the ruling prohibiting these charges, the Office of Price Administration on March 6, 1943, issued what it called an amendment to the regulations permitting the charges; but it was not an amendment at all. It did not change the regulations; it merely *construed* it as not prohibiting these charges.

Also, although the former interpretation prohibiting charges for icing changed the established business practice of charging for such services, the Price Administrator, in promulgating it, did not follow the requirement of section 902 of the Emergency Price Control Act, supra, by not making an affirmative finding that such a change was necessary to prevent evasion of the price regulation.[1] He apparently did not do so because he was not able to do so. The making of these charges was not an evasion of the ceiling prices.

That this is so is best demonstrated by the fact that other packers who were not equipped to perform the icing services were paid the same ceiling price for their meat as plaintiff was, and in addition the Quartermaster Corps was permitted to pay the icing charges to the railroad when the railroad iced the cars.

It is apparent that the Office of Price Administration recognized that its interpretation of its regulations was in error, when it said, in the "Statement of Considerations" accompanying the so-called amendment to the regulations, that: "The purpose of this amendment is to place sellers with facilities for doing initial icing of railroad cars in a position where such icing can be done without a penalty to them, and to place them in the same position with respect to icing costs as the seller who ships on an f. o. b. shipping point basis with the railroad performing the icing service and charging the buyer therefor."

Defendant makes one further defense. By Supplementary Order No. 9 plaintiff was permitted to charge the defendant with the alleged excess of its costs over the ceiling price, subject to a later determination of the equity of these charges, and with the understanding that if they were adjudged inequitable, they would be returned. By Order No. 119, issued on a number of plaintiff's applications for an increase in the ceiling price, plaintiff was permitted to retain $1,465,271 of its alleged excess costs. Defendant contends that a number of these applications included a claim for icing charges in the amount of $18,292.80, and that it cannot recover this amount again.

The record is not clear whether or not the applications acted upon in Order No. 119 contained an amount for icing charges, but the record indicates they did not. Apparently plaintiff treated the icing charges as a part of its transportation costs, and not as a part of its manufacturing costs.

---

1. Section 902 of the Emergency Price Control Act provides:

"The powers granted in this section shall not be used or made to operate to compel changes in the business practices, cost practices or methods, or means or aids to distribution, established in any industry, or changes in established rental practices, except where such action is affirmatively found by the Administrator to be necessary to prevent circumvention or evasion of any regulation, order, price schedule, or requirement under this Act (sections 901–946 of this Appendix)."

Order No. 119 granting relief under these applications stated that it was intended only as a reimbursement of the manufacturing costs of the dressed carcasses, laid down in plaintiff's cooler. No mention was made of icing or transportation charges. Instead, it appears that plaintiff made separate applications for relief with respect to its manufacturing costs and for relief from the interpretation prohibiting payment of the icing charges. The only action on the applications for relief relative to the icing charges seems to have been by the issuance of Amendment No. 2, supra.

Plaintiff is entitled to recover the amount of $43,512.65 Judgment for this amount will be entered.

HOWELL, MADDEN and LITTLE-TON, Judges, concur.

JONES, Chief Judge, took no part in the decision of this case.