**UNITED STATES of America, on relation of Mildred B. McCANS, and Mildred B. McCans on her own behalf, Plaintiff,**

v.

**ARMOUR & COMPANY, a corporation, Defendant.**

**Civ. A. No. 3673-54.**

United States District Court District of Columbia.

Nov. 27, 1956.

Roy St. Lewis and Carl L. Shipley, Washington, D. C., for plaintiff.

Perry S. Patterson (of Kirkland, Fleming, Green, Martin & Ellis), Washington, D. C., for defendant.

PINE, District Judge.

This is a qui tam action under 31 U.S.C.A. §§ 231–233 and 235, sometimes referred to as the False Claims Act. It is brought in the name of the United States by relator Mildred B. McCans. It alleges the commission by defendant of certain wrongful acts hereinafter set forth, and seeks to recover damages and forfeitures. The statute permits the United States to intervene,

but this it has declined to do, by formal notice. The case now comes before me on motions for summary judgment, filed by relator and defendant.

The wrongful acts are of a pecuniary nature and are alleged to have been committed between July 1, 1942, and February 15, 1943. During this period the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., and certain maximum price regulations and orders issued pursuant thereto were in effect. Among them was a price regulation establishing the maximum ceiling price which packers and processors might lawfully charge for sales of dressed hog carcasses and wholesale pork cuts. There were also in effect supplementary order No. 9 [1] and procedural regulation No. 6,[2] the former providing in brief that any person who had entered into or proposed to enter into a government contract, and who believed that an established maximum price impeded the production of a commodity which was essential to the prosecution of the war, might apply to the Office of Price Administration for adjustment of the maximum price of that commodity in accordance with the procedures provided in procedural regulation No. 6. Pending the issuance of an order granting or denying such an application, the seller could make deliveries to government war procurement agencies at prices requested therein, and in the event of denial of the application in whole or in part, the price would be revised downward and the applicant required to refund the excess.

Relator alleges that defendant sold and delivered to government war procurement agencies between the dates above set forth dressed hog carcasses, fresh and cured fabricated pork cuts, and canned pork products at prices in excess of the maximum ceiling prices, that it failed to apply to the Office of Price Administration for such increases, and that its acts were a wilful evasion of the maximum price regulations and price adjustment regulations and in violation of the Emergency Price Control Act. Following this, she alleges that defendant presented to officers of the United States for payment and allowance, invoices for dressed hog carcasses, fabricated pork cuts, and canned pork products at prices in excess of the maximum ceiling prices, and in this connection, presented claims to such officers, known by defendant to be false and fraudulent, and received payment therefor of various sums of money to which it was not entitled, thereby becoming liable to the United States under the False Claims Act. In consequence, she charges that the United States made overpayments in the sum of approximately $4,000,000, and claims damages and forfeitures under the Act of approximately $8,000,000, of which she would be entitled to receive personally not in excess of one-quarter, together with reasonable expenses and costs.

Defendant has answered, denying these charges and setting forth numerous affirmative defenses. An extensive deposition of relator has been taken, and numerous exhibits connected therewith have been filed, along with affidavits. As above stated, both the relator and defendant have filed motions for summary judgment. Examination of her deposition herein reveals the following facts and conclusions reached by her, viz.:

Relator commenced working for the United States in 1940, and was employed in the Quartermaster Corps of the Army from that time until her services were terminated on November 5, 1951. From 1944 until the termination of her employment, she was a claims examiner in the office of the Quartermaster General. In that capacity her duties consisted of auditing claims evidenced by contracts, invoices, etc., made by meat packers against the United States for meat and other articles sold to the Quartermaster Corps of the Army, auditing procurement records, and verifying that the prices charged were in accord with con-

1. 7 Fed.Register 5444.

2. 7 Fed.Register 5087.

tract provisions and ceilings established by the Office of Price Administration.

In 1947 and 1948 she was assigned to work in connection with a suit brought by defendant, known as the Beef Refund Suit (Armour & Co. v. Bowles, Em. App., 148 F.2d 546), and in 1949 and 1950 she was assigned to work on a suit known as the Icing Charges Case (Armour and Co. v. United States, 102 F.Supp. 987), 121 Ct.Cl. 716, both of which related to sales by defendant to the United States under the OPA Regulations and resulted in recovery by defendant. Her duties included research to ascertain what defenses or counterclaims were available to the United States. She also examined during her employment the Quartermaster file containing abstracts of bids and other documents relating to defendant's pork contracts, and concluded from her examination of this file that defendant had charged over-ceiling prices on pork products sold to the government during the period involved in this suit. Also during this period of employment she examined OPA records at the National Archives office to ascertain whether defendant had filed Procedural 6 applications as well as price regulations in the RFC warehouse, where OPA records in Washinton were filed, and the Quartermaster procurement records in an Alexandria warehouse. On the basis of this examination, she concluded that no procedural 6 applications had been filed by defendant, covering the sales of pork to the Federal government prior to April 1943, and as early as 1949 concluded that defendant had made over-ceiling sales of pork products to the Quartermaster Corps in the period from July 1942 to January 1943.

In January 1951, at her request, she was transferred to the office of the Quartermaster General in Chicago, Illinois, so that she could work on meat packer and OPA cases, and while in Chicago, between February 15, 1951, and November 5, 1951, had access to and examined defendant's invoices and pay-ment vouchers which were stored in the Quartermaster Building in Chicago. These documents reflected the prices paid to defendant for pork sold to the Government for the fiscal year 1943. During the same period she cross-checked records of the Cudahy Packing Co. with defendant's vouchers, to verify ceiling prices. By examining these vouchers, she claims she verified that the over-ceiling prices defendant had allegedly charged had been paid. Her purpose in examining defendant's vouchers was to ascertain whether the alleged unlawful prices listed in the contracts later examined in Washington had in fact been paid. Before termination of her employment, she had examined every payment voucher of defendant in the files, and had checked the payment vouchers relatable to the contracts listed in the amended complaint.

Her services were terminated on November 5, 1951, and on August 27, 1954, she instituted the present action. After filing suit, she called at the Department of Justice where approximately 33 of defendant's pork contracts executed during the period involved in this suit were made available to her. The contracts on which she bases her suit were obtained from the Department of Justice after her complaint was filed, and the computations of the alleged overcharges were made after the filing of her original complaint but prior to filing the amended complaint pursuant to order of this court to identify and list separately each transaction involved. She previously had examined abstracts of bids and reports of awards of these contracts made available to her while a government employee, and had seen copies of the contracts attached to payment vouchers in Chicago, where she examined them in detail. On several occasions before the termination of her employment, she brought to the attention of her superiors and other government officials the alleged over-ceiling prices charged by defendant.

█ The specific section under which relator brings this action is 31 U.S.C.A.

§ 232. In subparagraph (C) thereof it is provided that

"the court shall have no jurisdiction to proceed with any such suit * * * whenever it shall be made to appear that such suit was based upon *evidence* or *information* in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought." (Italics supplied.)

The first point raised by defendant in its motion is a challenge to the court's jurisdiction under this provision. It asserts that all the evidence or information on which this suit is based was in the possession of the United States at the time the suit was brought, and still is in its possession, and therefore the court has no jurisdiction to proceed. Its position is that the contracts of purchase and sale, invoices, vouchers, OPA regulations, files, etc., are the basis, and only basis, for the suit, and relator's deposition makes it undeniable that they were in the possession of the United States. Relator makes no argument to the contrary, except her claim in her Memorandum of Points and Authorities that the "thrust" of her case is the failure of defendant to file procedural 6 applications, above referred to, for approval. Of course the negative fact that defendant did not file such applications was as much in the possession of the United States before she informed them as it was afterward, and I am unable to follow her argument that the notification of failure to file such applications can be the basis for supplying information of the existence of OPA violations and subsequent false claims. The contracts, invoices, vouchers, etc., would disclose on their face whether over-ceiling charges had been made and false claims submitted, when compared with the applicable maximum price regulations, and the United States would have been in position to proceed against defendant, without more, subject to the defense of procedural 6 applications. If filed, these would have absolved defendant from the wrongdoing charged, and if not filed, would have left defendant without this defense. It is therefore apparent that the "evidence or information" on which her suit is based was in the possession of the United States, if the language of the statute be literally read.

However, if the language be not literally read and be construed to exclude instances where, although the evidence or information was latently in the possession of the United States, it had to be pointed out or analyzed to make it of value to the United States, as contended by relator, this court would still have no jurisdiction because relator did on occasions during her employment by the United States bring her claim of over-ceiling prices charged against defendant to the attention of her superiors. This was sufficient to point out the wrongdoing and make the evidence or information already in its possesion of value to the United States, and was sufficient, if true, to justify legal proceedings by the United States, prior to which it presumably would make certain that no procedural 6 applications were available in defense. Consequently the evidence or information was no longer latent, by reason of relator's own acts prior to termination of her employment.

I am therefore of the opinion that this court is without "jurisdiction to proceed" because it has been made to appear that this suit was based upon "evidence or information in the possession of the United States'" at the time the suit was brought.

In addition, the statute on which relator relies for authority to bring her action has for its purpose, among others, the exclusion from its coverage of this type of claim, sometimes described as parasitical. This is demonstrated by its legislative history, as follows: In United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 392, 87 L.Ed. 443, decided January 18, 1943, the court held that under the statute, as it then existed, a person who allegedly contributed nothing to the discovery of the

fraud, could nevertheless bring an action thereunder. Mr. Justice Jackson, being concerned over the implications of the opinion, dissented, and in his dissent had this to say:

"To accept the view of 1863 to mean that today law enforcement officials could use information gleaned in their investigations to sue as informers for their own profit, would make the law a downright vicious and corrupting one. Fortunately no one in the executive department has ever suspected that such an interpretation as the Court now indulges could be placed upon this statute. If we were to add motives of personal avarice to other prompters of official zeal the time might come when the scandals of law-enforcement would exceed the scandals of its violation."

Because of this decision, and apparently responding to the views of Mr. Justice Jackson and also becoming aware of the abuses which had arisen under this statute as it then existed,[3] Congress, after extensive hearings, almost completely rewrote it, including the present new provision above quoted. In this connection, Congressman Hancock, one of the Managers on the part of the House of the revised bill stated during the debate as follows:

"The temptation and the opportunity is tremendous under the present law for renegotiators, contracting officers of the various purchasing agencies of the government, and agents for collectors of internal revenue to take advantage of the information they discovered in the course of the business to enrich themselves by instigating informer's suits. That is a temptation we wish to remove." 89 Cong.Record 10849.

Congressman Walter, also a Manager, made the following statement:

"We feel that by enacting this compromise legislation * * *

there will not be this ever-present invitation * * * for dishonest and unscrupulous investigators to turn over information to their friends or co-conspirators for the purpose of bringing suit against our citizens on information that either comes to them by reading an indictment or a bill of complaint or through testimony before some committee or which *comes to them in their official capacity as a representative of the United States.*" 89 Cong.Record 10846. (Emphasis supplied.)

It would thus appear that the present statute was intended to prevent a former government employee from bringing an action of this sort, where the information upon which the suit is founded was obtained by reason of his government employment. I therefore conclude on this basis also that relator may not maintain her action.

Furthermore, plaintiff's claim is barred by the statute of limitations. This statute is six years, 31 U.S.C.A. § 235. However, on August 24, 1942, Congress passed a Wartime Suspension of Limitations Act, 18 U.S.C. § 590a, 1940 Ed., 56 Stat. 747, which provides that

"The running of any existing statute of limitations applicable to *offenses* involving the defrauding or attempts to defraud the United States or any agency thereof, whether by conspiracy or not, and in any manner, and *now indictable* under any existing statutes, shall be suspended until June 30, 1945, or until such earlier time as the Congress by concurrent resolution, or the President, may designate." (Italics supplied.)

It will be noted that this statute relates to indictable offenses, and was not applicable to civil actions. The statute of limitations under the False Claims Act was therefore not suspended by the Wartime Suspension of Limitations

---

3. *United States* v. *Rippetoe,* 4 Cir., 178 F. 2d 735.

Act, but in 1944 Congress in the Contract Settlement Act, 18 U.S.C. § 3287, 58 Stat. 649, 667, enacted July 1, 1944, amended the language of the Suspension of Limitations Act by deleting the term "now indictable." This brought the False Claims Act within its purview, but it was not effective until July 21, 1944. The statute of limitations in this case, therefore, ran until July 21, 1944, and the time between the acts complained of and July 21, 1944, must be deducted from the six-year limitation period. The last date on which defendant is alleged to have committed the acts was February 15, 1943, and one year, five months, and six days of the limitation period therefore had expired when the Contract Settlement Act of 1944 became effective. As provided in that Act, the statute of limitations commenced to run again on December 31, 1949, three years after termination of hostilities.[4] Relator's complaint was filed on August 27, 1954, which was four years, seven months, and 27 days after the Suspension of Limitations Act was no longer applicable. Adding to this period the one year, five months, and six days of limitations which had expired from February 15, 1943, to July 21, 1944, the complaint was filed six years, one month, and three days after the last date of the alleged wrongful acts. Therefore, her complaint does not come within the six-year period, and the claim is barred.

Relator seeks to overcome this bar by contending that the Suspension of Limitations Act, as originally enacted and before the amendment above referred to, applied to civil cases. This would, of course, make the amendment superfluous, and I find no support for her contention. The cases cited by her are not contrary to the position taken herein, inasmuch as they relate either to criminal cases or claims relating to periods of time made after the amendment of 1944, which concededly makes the Suspension of Limitations Act then apply to civil actions in addition to criminal proceedings. Indeed, the opinion in one of the cases cited by her, namely United States v. Kolsky, D.C., 137 F. Supp. 359, states that it was agreed that the prior Wartime Suspension Act applied only to criminal actions and then went on to say that inclusion of civil actions was intended by the later Act. Also, in Dugan & McNamara, Inc., v. United States, 127 F.Supp. 801, 130 Ct. Cl. 603, Court of Claims, the Court came to the conclusion that the deletion of the words "now indictable" in the 1944 Act leads to the conclusion that the Suspension Act then became applicable to all actions involving fraud against the United States, whether the Government seeks redress by criminal or civil means.

Finally, I should add that the complaint involves 15 contracts, but at the argument it was conceded that in respect of nine of them, the defense of res judicata is available by virtue of the decision of the Court of Claims in the case of Armour & Co. v. United States, 1952, 102 F.Supp. 987, 121 Ct.Cl. 716, the so-called Icing Charges Case, above referred to.

There being no genuine issue of material fact in respect of the points above discussed, the court has no jurisdiction to proceed with the action, and the relator is barred from maintaining it for the reasons set forth. Accordingly, defendant's motion for summary judgment will be granted, and relator's motion for the same relief will be denied.

Counsel will submit appropriate order.

4. The period of suspension of limitations provided by this section terminated three years after the termination of hostilities of World War II, which was proclaimed at 12 o'clock noon of December 31, 1946, by Proc. No. 2714, 12 F.R. 1.