**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 21, 2012

No. 11-10747

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

DAVID CHARLES PFLUGER,

Defendant–Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This appeal arises out of the Government's indictment of Defendant–Appellant David Pfluger for frauds Pfluger committed while serving as a Lieutenant Colonel in the United States Army in Iraq. Centrally, his appeal deals with a minimally developed area of law—the applicability of 18 U.S.C. § 3287. Better known as the Wartime Suspension of Limitations Act, section 3287 suspends the running of the statute of limitations for certain crimes when the United States is at war. Because we find § 3287 applicable to Pfluger, we AFFIRM.

No. 11-10747

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In October 2003, Pfluger was deployed to Iraq as a Lieutenant Colonel in the U.S. Army's 82nd Airborne Division, after having been called up to active duty from his position in the Texas National Guard.  Pfluger's duties in Iraq included being the "Mayor" of Forward Operating Base ("FOB") Ridgeway, a former Iraqi base in the al-Anbar Province.  In his capacity as FOB Ridgeway's Mayor, Pfluger was responsible for the infrastructure and day-to-day operations of the base, including the provision of room, board, utilities, and other basic services, as well as responsibility for providing perimeter security for the base. Ancillary to these responsibilities, Pfluger frequently interacted directly with contractors (particularly Iraqi contractors) who performed much of this work, including allowing them access to the base, reviewing their work, ensuring prompt payment, identifying additional work needed at the base, and suggesting contractors for new work.

During Pfluger's tenure as Mayor of FOB Ridgway, he interacted particularly with certain individuals identified in the record solely by initials: AHS, AES, SS, SA, and TA.  Although he did not have the authority to do so, Pfluger recommended that these contractors be awarded contracts. Pfluger used his position of responsibility to enrich himself unlawfully.  Specifically, in January 2004, Pfluger directed U.S. military personnel to transfer about 20,000 gallons of fuel from Iraqi storage tanks to AHS, AES, and SS's tanker trucks—a benefit of about $12,500.  Pfluger also gave AHS, AES, and SS preferential treatment by bypassing or relaxing security requirements for them and their employees; moved their invoices to the front of the line for prompt payment; and issued weapons permits to their employees, thereby authorizing them to carry weapons while driving in al-Anbar Province.  In exchange, AHS, AES, and SS paid Pfluger about $10,000 in cash and gave him men's and women's jewelry and a man's suit.  As for TA and SA, Pfluger also allowed them to bypass security,

No. 11-10747

ensured their prompt payment, and issued weapons permits to their employees. In exchange, Pfluger received approximately $1,500 in cash from TA and SA. All of these acts occurred between December 1, 2003 and May 16, 2004.

The Government indicted Pfluger on November 12, 2010, charging him with one count of conspiracy to commit offenses against the United States (in violation of 18 U.S.C. § 371), two counts of accepting gratuities (in violation of 18 U.S.C. § 201(c)(1)(B)), and one count of conversion of property while a public official (in violation of 18 U.S.C. § 654). Pfluger moved to dismiss the indictment based on the expiration of the statute of limitations, *see* 18 U.S.C. § 3282 (2006), which the district court denied based on the applicability of § 3287. Thereafter, Pfluger entered a conditional guilty plea, wherein he reserved his right to appeal (1) the denial of his motion to dismiss and (2) "the application of the four-point increase in offense level under U.S.S.G. § 2C1.2(b)(3), should the trial court apply that increase at sentencing." The district court sentenced Pfluger to eighteen months of imprisonment, followed by three years of supervised release, and ordered restitution to the Republic of Iraq in the amount of $12,500, and to the Defense Finance and Accounting Services in the amount of $11,500.

## II. STANDARD OF REVIEW

"We review the district court's fact findings in relation to the statute of limitations for clear error and its legal conclusions *de novo*." *United States v. McMillan*, 600 F.3d 434, 443–44 (5th Cir. 2010) (internal quotation marks omitted). As the sole issue[1] concerns the construction of § 3287, a question of statutory interpretation, our review is de novo. *See United States v. Williams*, 602 F.3d 313, 315 (5th Cir. 2010).

---

[1] In his initial brief to this court, Pfluger also challenged the propriety of the district court's restitution award. He has since conceded that such a challenge is barred by the appeal waiver he signed in connection with his guilty plea. Oral Argument at 38:46, *available at* http://www.ca5.uscourts.gov/OralArgRecordings/11/11-10747_6-4-2012.wma

No. 11-10747

## III.  DISCUSSION

The Wartime Suspension of Limitations Act ("WSLA") provides,[2] in relevant part,

> When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States . . . shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.

18 U.S.C. § 3287 (2006).  The WSLA has three components: (1) a triggering clause ("When the United States is at war the running of [the applicable statute of limitations] shall be suspended . . ." ), (2) a suspension period ("three years"), and (3) a termination clause ("suspended until . . . after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.").  Pfluger's challenge only concerns the termination clause.[3]

---

[2] Congress amended the WLSA in 2008 through the Wartime Enforcement of Fraud Act.  *See* Pub. L. No. 110-417 § 855, *codified at* 18 U.S.C. § 3287 (2009 Supp.).  Section 3287 now provides:

> When the United States is at war *or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544 (b))*, the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States . . . shall be suspended until *5 years* after the termination of hostilities *as proclaimed by a Presidential proclamation, with notice to Congress*, or by a concurrent resolution of Congress.

(changes in italics).  The Government contends that the amended WSLA applies to Pfluger's conduct, while Pfluger contends that to apply all of the 2008 amendments to him retroactively would violate the Ex Post Facto Clause.  In order to avoid the thorny retroactivity issue, we assume that the 2008 amendments do not apply retroactively to Pfluger's conduct.  *See A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 258 (5th Cir. 2010) (discussing constitutional avoidance).

[3] On September 18, 2001, Congress authorized the use of military force against those tied to the attacks of September 11.  Authorization for the Use of Military Force ("AUMF"), Pub. L. 107-40.  On October 11, 2002, Congress authorized the president to use military force to "defend the national security of the United States against the continuing threat posed by Iraq" and "enforce all relevant United Nations Security Council resolutions regarding Iraq."

No. 11-10747

Although the language of the WSLA would seem to allow the Government to indict any frauds against the United States that occurred up to the end of the suspension period plus the relevant statute of limitations,[4] the Supreme Court in *United States v. Smith*, 342 U.S. 225 (1952), held that § 3287 only applied to crimes committed after the triggering of the suspension of limitation but before the termination of hostilities. *Id.* at 228. Therefore, to resolve Pfluger's appeal, we must determine (1) what conditions serve to mark the termination of hostilities and (2) whether were such conditions were in place prior to May 2004, when the last of Pfluger's criminal conduct occurred. Unlike the triggering clause, which has been subjected to some litigation since World War II,[5] only one court has addressed the WSLA's termination clause—*United States v. Prosperi*, 573 F. Supp. 2d 436 (D. Mass. 2008).

*Prosperi* dealt with contracting fraud arising out of the Boston highway project called the "Big Dig." *Id.* at 439. After delineating a four-factor test to determine if the United States was "at war" for the purposes of the WSLA's triggering clause and finding that all four factors weighed in favor of the

Authorization for the Use of Military Force against Iraq ("AUMF-I"), Pub. L. 107-243. Pfluger concedes that the armed conflicts engaged in pursuant to the AUMF and AUMF-I constitute the United States being "at war" for the purposes of the WSLA's triggering clause.

[4] In *United States v. Grainger*, 346 U.S. 235 (1953), the Supreme Court explained how WSLA's World War II precursor operated. Once President Franklin D. Roosevelt proclaimed the end of World War II on December 31, 1946, *see* 3 C.F.R. 77–78 (1946 Supp.), the three-year statute of limitations, *see* 18 U.S.C. § 3282 (1946), began to run three years after the proclamation date—December 31, 1949 (i.e., from January 1, 1950 to its expiration on December 31, 1952). *Grainger*, 346 U.S. at 246. Therefore, for Grainger's frauds, which occurred in 1946, the Government had until December 31, 1952 to bring an indictment. *Id.*

[5] *See United States v. Pearson*, No. 2:09-CR-43, 2010 WL 3120038 (S.D. Miss. Aug. 4, 2010)*; United States v. Western Titanium, Inc.*, No. 08-CR-4229, 2010 WL 2650224 (S.D. Cal. July 1, 2010); *United States v. Prosperi*, 573 F. Supp. 2d 436 (D. Mass. 2008); *United States v. Shelton*, 816 F. Supp. 1132 (W.D. Tex. 1993). *See also generally* Erin M. Brown*,* Note, *The Wartime Suspension of Limitations Act, the Wartime Enforcement of Fraud Act, and the War on Terror*, 85 Notre Dame L. Rev. 313, 317 (2009).

triggering clause being met, *id*. at 449–54, the court turned its attention to interpreting when the hostilities terminated. It reasoned that although "[t]raditionally the end of a war is marked by the signing of a formal peace treaty[,] . . . [t]he end of more recent conflicts have been signaled by Presidential pronouncement or by the diplomatic or de jure recognition of a former belligerent or a newly constituted government." *Id*. at 454. In "identify[ing] a clear demarcation point at which the tolling provisions of the [WSLA] cease to run," *Prosperi* held that the War in Afghanistan ended on December 22, 2001 with the formal recognition of Hamid Karzai's government and that the Iraq War ended on May 1, 2003 when President George W. Bush, "while aboard the *USS Abraham Lincoln*, proclaimed that '[m]ajor combat operations in Iraq have ended.'" *Id*. at 454–55.

Pfluger urges us to adopt this functional approach to the termination clause. Emphasizing the Supreme Court's statement in *Toussie v. United States*, 397 U.S. 112 (1970), that "criminal limitations statutes are to be liberally interpreted in favor of repose," *id*. at 115 (internal quotation marks omitted), Pfluger argues that the termination clause can be met either (1) "by implication from the terminations of one of the conditions for the original authorization of force" or (2) "by explicitly fulfilling the [formal] criteria set forth in the [WSLA]." He then posits, as *Prosperi* held, that an implied condition subsequent for the AUMF was the recognition of Karzai's non-Taliban regime in Afghanistan and that an implied condition subsequent for the AUMF-I was the toppling of Saddam Hussein's Ba'athist regime.

We are unpersuaded. "When interpreting a statute, we are bound to follow the plain and unambiguous meaning of the statutory language." *United States v. Shabazz*, 633 F.3d 342, 345 (5th Cir. 2011) (internal quotation marks omitted). In this case, the plain and unambiguous language of the WSLA mandates formal requirements for the termination clause to be met. The Supreme Court

recognized as much in *United States v Grainger*, 346 U.S. 235 (1953). In *Grainger*, the Court faced a False Claims Act indictment where the indictment was filed in 1952 but where the relevant conduct occurred in 1945 and 1946. *Id.* at 237–38. The Government had sought to invoke the WLSA's World War II precursor, which suspended the running of the statute of limitations "until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress." *Id.* at 242. The indictments would have been untimely had the suspension been terminated by Japan's surrender in September 1945. The Court in upholding the indictment stated, "The effect of this language . . . is inescapable. . . . [The termination clause] made a movable date which can occur only three years after the date of the termination of hostilities as proclaimed by the President or Congress." *Id.* at 246. The proclamation that the Court found operative was Truman's of December 31, 1946. *Id.* (citing 3 C.F.R. 77–78 (1946 Supp.)). Rather than catalog the many presidential and congressional announcements, tributes, and statements about World War II ending with the Japanese surrender, or analyze the status of the troops' return to civilian life, the Court instead looked at the precise language of the WSLA itself and the specific formal requirements mandated by its text.

Pfluger contends that the formal approach we adopt today would lead to such absurd results that we should not be bound by the canon of plain meaning. Specifically, he notes that formally the first Gulf War has not yet ended because neither Congress nor the president has fixed an end date for those hostilities. Barbara Salazar Torreon, Congressional Research Serv., U.S. Periods of War and Dates of Current Conflicts (2011), *available at* http://www.fas.org/sgp/crs/natsec/RS21405.pdf. We admit that it would seem suspect if the Government had tried to indict Pfluger solely based on the suspension of limitations triggered by that conflict, but those are not the facts of his case. We need only determine that it is not an absurd result that the

hostilities in the armed conflict authorized by either the AUMF or the AUMF-I were ongoing in May 2004.  Even viewing the WSLA through the functional lens that Pfluger advocates, it does not strike us as absurd that hostilties were ongoing during the period when Pfluger was committing his frauds.  *See Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (Jun. 28, 2004) ("Active combat operations against Taliban fighters apparently are ongoing in Afghanistan.") (citing Constable*, U.S. Launches New Operation in Afghanistan*, Wash. Post, Mar. 14, 2004, at A22) (additional citation omitted).

Since neither Congress nor the president met the formal requirements for terminating the WSLA's suspension of limitations as of May 2004 (nor yet to this date), we hold that § 3287 applies to Pfluger and accordingly that the Government's indictment in this case is valid.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM.