Reversed and remanded by published opinion. Judge FLOYD wrote the majority opinion, in which Judge WYNN joined. Judge WYNN wrote a separate concurring opinion. Judge AGEE wrote a separate opinion concurring in part and dissenting in part.
OPINION
FLOYD, Circuit Judge:
Appellant Benjamin Carter appeals the district court’s dismissal of his complaint with prejudice. The matter was initiated upon Carter’s filing of a qui tam lawsuit under the False Claims Act (FCA), 31 U.S.C. § 3729. The subject matter underlying this case involves Appellees’ — Halliburton Company; KBR, Inc.; Kellogg Brown & Root Services, Inc.; and Service Employees International, Inc. (collectively KBR) — alleged fraudulent billing of the United States for services provided to the military forces serving in Iraq. The district court concluded that it lacked subject matter jurisdiction over Carter’s claims because of the False Claims Act’s first-to-file bar, 31 U.S.C. § 3730(b)(5). The district court also held that Carter’s complaint had been filed beyond the six-year statute of limitations in the FCA and was not tolled by the Wartime Suspension of Limitations Act (WSLA), 18 U.S.C. § 3287, which the court ruled does not apply to non-intervened qui tam cases. Accordingly, the district court dismissed Carter’s complaint with prejudice. Because we conclude that the district court had subject matter jurisdiction and find that the WSLA applies to this action, we reverse. Further, because it may be appropriate for the district court to make factual findings to consider the public disclosure claim urged by KBR, we remand so the district court can consider this issue.
I.
In his complaint, Carter brings a quitam action under the False Claims Act, 31 U.S.C. §§ 3729 through 3733. The FCA allows the United States to bring suit to recover funds and also allows, through the Act’s quitam provisions, for a private plaintiff (relator) to sue in place of the government and keep a share of the proceeds. See 31 U.S.C. § 3730(a)-(d). Carter alleges that KBR falsely billed the United States for services performed in Iraq. Specifically, Carter alleges that KBR “knowingly presented to an officer or employee of the United States Government ... false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).” Carter goes on to allege that KBR “knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government” in violation of 31 U.S.C. § 3729(a)(2).
KBR provided logistical services to the United States military in Iraq under a government contract. Carter worked for KBR as a reverse osmosis water purification unit (ROWPU) operator at two camps in Iraq from mid-January 2005 until April 2005. Carter was hired to test and purify water for the troops in Iraq. Carter claims that KBR was in fact not purifying water during the time period but was repeatedly misrepresenting to the United States that it was. Carter submits that water purification did not actually begin until May 2005. Further, Carter maintains that he and his fellow employees *175 were instructed to submit time sheets for twelve-hour days for work that they performed on ROWPU functions. During this time, Carter states that he was actually not working any hours on ROWPU functions. Carter also contends as part of an overall scheme by KBR to overbill the government for labor charges, that all trade employees were required to submit time sheets totaling exactly twelve hours per day and eighty-four hours per week and that it was “routine practice” of the employees to do so regardless of actual hours worked. As a result, according to Carter, the United States paid KBR for work not actually performed.
Carter filed his original complaint under seal on February 1, 2006, in the United States District Court for the Central District of California. United States ex rel. Carter v. Halliburton Co., No. 06-ev-0616 (C.D.Cal. filed Feb. 1, 2006). After over two years of investigation into the matter, the action was unsealed in May 2008. Shortly thereafter, the case was transferred to the Eastern District of Virginia in October 2008, at which point Carter amended his complaint. United States ex rel. Carter v. Halliburton Co., No. 08-ev-1162 (E.D.Va. filed Feb. 1, 2006). The district court dismissed Carter’s first amended complaint without prejudice in January 2009 for failure to plead fraud with particularity. Carter then amended his complaint for a second time and refiled his complaint in January 2009 (Carter 2009). KBR then moved to dismiss Carter’s second amended complaint under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, which the district court granted in part. The district court, however, refused to dismiss counts 1 and 4. Count 1 alleged a scheme by KBR to submit fraudulent claims for payment to the government, and count 4 alleged fraudulent statements knowingly made to the government to receive claims for payment. At this point, KBR answered the remaining allegations and the case proceeded through discovery, which closed in March 2010.
In March 2010, one month before the scheduled trial date, the parties were contacted by the United States Department of Justice, who informed them of the existence of a False Claims Act case containing similar allegations filed under seal in December 2005, in the United States District Court for the Central District of California, United States ex rel. Thorpe v. Halliburton Co., No. 05-cv-08924 (C.D.Cal. filed Dec. 23, 2005). Thorpe also alleges that KBR’s standard operating procedure was billing twelve hours per day, without regard to the actual hours worked to perpetuate a scheme to overbill the government. In April 2010, KBR filed a motion to dismiss Carter 2009, arguing that Thorpe constituted a “related” action under FCA § 3730(b)(5). In response, Carter argued that Thorpe was materially different from his case because he focused on KBR’s alleged fraudulent misrepresentation to the government that KBR was actually performing water services for which it was submitting bills.
The district court rejected Carter’s characterization, reasoning that he must show that KBR employees were reporting hours that they did not work and the fact that KBR was not performing water services is merely evidence that the time sheets were false. The district court dismissed Carter 2009 without prejudice on May 10, 2010. Carter, No. 08-ev-1162. Carter appealed the dismissal on July 13, 2010.
Thereafter, the United States District Court for the Central District of California dismissed the Thorpe action on July 30, 2010. In response, Carter re-filed his complaint (Carter 2010) in the United *176 States District Court for the Eastern District of Virginia while his appeal was still pending. United States ex rel. Carter v. Halliburton Co., No. 10-ev-864 (E.D.Va. filed Aug. 4, 2010). When Carter re-filed his complaint, he also sought to dismiss his appeal in the 2009 action. This Court granted Carter’s motion to dismiss his appeal on February 14, 2011. Meanwhile, Carter 2010 proceeded in the district court and, on May 24, 2011, the district court dismissed Carter’s complaint without prejudice, on the grounds that Carter had filed Carter 2010 while Carter 2009 was still pending on appeal, thereby creating his own jurisdictional bar under the FCA’s first-to-file provision. Carter, No. 10-cv-864. Carter chose not to appeal this ruling.
However, Carter re-filed his complaint 0Carter 2011) on June 2, 2011. United States ex rel. Carter v. Halliburton Co., No. 11-cv-602 (E.D.Va. filed June 2, 2011). The district court unsealed the complaint on August 24, 2011. The complaint in this case is identical to the earlier 2010 complaint as well the second amended complaint filed in 2009. After the complaint was unsealed, KBR moved to dismiss the action, arguing that the complaint was barred by two related actions, that the case was time barred, and that the case was barred by the public disclosure provision of the FCA.
At the time Carter 2011 was filed, two allegedly related cases were pending: United States ex rel. Duprey, No. 8:07-cv-1487 (D.Md. filed June 5, 2007) and another action — that is under seal — filed in Texas in 2007. Duprey and the Texas action allege that KBR “knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).” Since at least March 2003, KBR provided shipping and transportation support in Iraq for the United States military. The Duprey relator was employed by KBR as a truck driver in Iraq from March 27, 2005, to January 15, 2006. The Texas relators were also truck drivers in Iraq, and at least one relator was present in Iraq during the period of September 2003 to March 15, 2004. Both complaints allege substantially similar claims, namely that KBR had a policy that its drivers enter time sheets reflecting a twelve hour workday and an eighty-four hour work week, without regard to actual hours worked. The relators alleged that this practice was widespread throughout KBR’s operations in Iraq and elsewhere. Duprey was subsequently voluntarily dismissed in October 2011, and the Texas action was voluntarily dismissed in March 2012.
The district court granted KBR’s motion and dismissed the complaint with prejudice on November 29, 2011, ruling that the case was related to Duprey and the Texas action. The court also found that Duprey was “pending” for purposes of the first-to-file bar, because it had not been dismissed at the time Carter 2011 was filed. The court considered whether the Texas action was also “pending” as to bar Carter 2011, but ultimately concluded that it need not decide the issue because at least one case — Duprey—was pending. The district court also held that Carter 2011 had been filed beyond the FCA’s six-year statute of limitations and would be time barred should it be re-filed. Because of this reason, the court dismissed the case with prejudice. The district court further held that Carter’s action was not tolled by the WSLA. The district court held that the WSLA does not apply to claims under the FCA brought by private relators. Finding ample grounds to dismiss the action, the district court did not consider whether the complaint was barred by the public disclo *177 sure provision of the FCA. Carter timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.
II.
We review de novo the district court’s legal rulings, such as its granting of KBR’s motion to dismiss. Simmons v. United Mortg. & Loan Inv., LLC, 634 F.3d 754, 762 (4th Cir.2011). To the extent that the decisions below involved legal conclusions based upon factual determinations, we review the factual findings for clear error, viewing the evidence in the light most favorable to Carter. See id.
III.
We first address Carter’s contention that the WSLA tolls his action and therefore, that his claims are not time barred under the FCA.
A.
First, as a general matter, qui tam actions must be brought within six years after the date on which the alleged violation occurred. 31 U.S.C. § 3731(b). The WSLA was enacted in 1942 to extend the time for prosecution to bring charges relating to criminal fraud offenses against the United States during times of war. Wartime Enforcement Fraud Act of 2008, S.Rep. No. 110-431, at 2. When enacted, the law applied to “offenses involving the defrauding or attempts to defraud the United States ... and now indictable under any existing statutes.” Dugan & McNamara, Inc. v. United States, 127 F.Supp. 801, 802 (Ct.C1.1955). When amended in 1944, the phrase “now indictable” was deleted. Id. at 802. The WSLA was later codified, and is now to be used whenever the country is at war. Id.
The Fifth Circuit has determined that the WSLA has three components: “(1) a triggering clause (‘When the United States is at war the running of [the applicable statute of limitations] shall be suspended ...’), (2) a suspension period (‘three years’), and (3) a termination clause (‘suspended until ... after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.’).” United States v. Pfluger, 685 F.3d 481, 483 (5th Cir.2012) (alterations in original) (quoting 18 U.S.C. § 3287). The Supreme Court has held that the WSLA applies only to offenses committed after the triggering clause and before the termination of hostilities. United States v. Smith, 342 U.S. 225, 229-30, 72 S.Ct. 260, 96 L.Ed. 252 (1952). The running of the limitations period then begins when hostilities are terminated. Id. at 229-30, 72 S.Ct. at 262.
Prior to October 4, 2008, the WSLA provided:
When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States ... shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.
18 U.S.C. § 3287 (2006) (current version at 18 U.S.C. § 3287 (2011)). In 2008, the Wartime Enforcement of Fraud Act (WEFA) amended the WSLA to expand its times of operation to “[w]hen the United States is at war or Congress has enacted specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b)).” See Wartime Enforcement of Fraud Act, Pub.L. No. 110-417 § 855, codified at 18 U.S.C. § 3287. Additionally, the suspension period was extended until “5 years after the termination of hostilities as proclaimed by a Presidential proclama *178 tion, with notice to Congress, or by a concurrent resolution of Congress.” Id.
Courts are in disagreement as to which version of the WSLA applies to offenses that occurred before the amendments of 2008. Additionally, courts are in conflict as to whether the pre-amendment WSLA requires a formal declaration of war or whether the authorized use of military force shall suffice.
B.
Carter contends that the conflict in Iraq in 2005 is sufficient to trigger WSLA’s “at war” status under either version of the WSLA. KBR however, urges us not to apply the post-amendment WSLA because it believes that the post-amendment WSLA implicates its constitutional due process rights in that the Act may allow a statute of limitations to run indefinitely.
The question presented is the meaning of “at war” as it appears in the WSLA. As with all questions of statutory construction, we begin by examining the statute’s language. “[W]hen a statute speaks with clarity to an issue[,] judicial inquiry into the statute’s meaning, in all but the most extraordinary circumstance, is finished.” Ramey v. Dir., Office of Workers’ Comp. Programs, 326 F.3d 474, 476 (4th Cir.2003) (second alteration in original) (quoting Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992)) (internal quotation marks omitted). In interpreting a statute we “must presume that a legislature says in a statute what it means and means in a statute what it says there.” Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 461-62, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002).
Although the meaning of “at war” may appear unambiguous at first glance, its meaning in the context of the WSLA is not so clear. As the Supreme Court has noted, “Congress in drafting laws may decide that the Nation may be ‘at war’ for one purpose, and ‘at peace’ for another.” Lee v. Madigan, 358 U.S. 228, 231, 79 S.Ct. 276, 3 L.Ed.2d 260 (1959). Therefore, we must determine what Congress meant by “at war” in the context of the WSLA.
As an initial matter, we find it unnecessary to decide which version of the WSLA applies because we find that the Act does not require a formal declaration of war. Therefore, under either version of the Act, the United States was at war when the acts at issue occurred. We find that the Act does not require a formal declaration of war for several reasons. First, had Congress intended the phrase “at war” to encompass only declared wars, it could have written the limitation of “declared war” into the Act as it has in numerous statutes. See, e.g., 28 U.S.C. § 2416(d) (tolling provision for civil claims by the United States seeking money damages applies only when “the United States is in a state of war declared pursuant to article I, section 8, of the Constitution of the United States.”); 50 U.S.C. § 1829 (“Notwithstanding any other provision of law, the President, through the Attorney General, may authorize physical searches without a court order ... to acquire foreign intelligence information for a period not to exceed 15 calendar days following a declaration of war by the Congress.”).
Next, we believe that requiring a declared war would be an unduly formalistic approach that ignores the realities of today, where the United States engages in massive military campaigns resulting in enormous expense and widespread bloodshed without declaring a formal war. In fact, the United States has not declared war since World War II. However, there have been extensive military engagements in Vietnam, Korea, Kosovo, Afghanistan, *179 and twice in Iraq. Indeed, the Supreme Court has found that the laws of war apply to non-declared wars, for example the war in Afghanistan. See Hamdi v. Rumsfeld, 542 U.S. 507, 518, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (holding that the detention of enemy combatants during conflicts is an incident of the rules of war). Surely these circumstances result in situations in which fraud can easily be perpetuated against the United States just as much as a formally declared war. The purpose of the WSLA—to combat fraud at times when the United States may not be able to act as quickly because it is engaged in “war”—would be thwarted were we to find that the United States must be involved in a declared war for the Act to apply. See generally Wartime Enforcement Fraud Act of 2008, S.Rep. No. 110-431, at 1-3.
With these principles in mind, we now address the specific conflict in Iraq. On October 11, 2002, Congress authorized the President to use military force to “defend the national security of the United States against the continuing threat posed by Iraq” and “enforce all relevant United Nations Security Council resolutions regarding Iraq.” Authorization for the Use of Military Force against Iraq (AUMF), Pub.L. 107-243, 116 Stat. 114 (2002). Although not a formal recognition of war, the AUMF signaled Congress’s recognition of the President’s power to enter into armed hostilities. Based on the foregoing analysis, we find that the United States was “at war” in Iraq from the date of the AUMF issued by Congress on October 11, 2002.
We now turn to when—and if—the hostilities in Iraq terminated. The Fifth Circuit recently considered this issue in Pfluger, 685 F.3d 481. There the court determined that termination clause of the WSLA required compliance with the formal requirements set out in the clause because the language of the clause was plain and unambiguous. Id. at. 485. We agree. The pre-amendment and post-amendment WSLA both specify that termination shall not occur until the Act’s formalities have been met. In the pre-amendment WSLA, termination occurs when “proclaimed by the President or by a concurrent resolution by Congress.” 18 U.S.C. § 3287 (2006). In the post-amendment WSLA, termination happens when “proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress.” 18 U.S.C. § 3287 (2011). Neither Congress nor the President had met the formal requirements of the Act for terminating the period of suspension when the claims at issue were presented for payment. We therefore conclude that the United States was at war during the relevant time period for purposes of the WSLA.
C.
KBR next argues that the WSLA does not apply to Carter’s claims because the WSLA by its plain terms applies only to criminal cases. KBR bases its argument on the language in the statute that states it applies to “offense[s] involving fraud” and reasons that “offense” ordinarily means only crimes. 18 U.S.C. § 3287. Resolution of this issue requires us to interpret the meaning of “offense” as used in the WSLA.
In Dugan & McNamara, 127 F.Supp. at 802-04, the court examined both the legislative history of the Act and the meaning of “offense.” The court reasoned that the term “offense” in the 1942 version referred only to criminal penalties. Id. However, when amended in 1944, the phrase “now indictable” was deleted. The WSLA was then applicable to all actions involving fraud against the United States. Id. at 802 (“The 1942 statute with the phrase ‘now indictable’ spoke clearly of only crimi *180 nal offenses. The 1944 enactment deleted that phrase.... This deletion leads us to the conclusion that the Suspension Act then became applicable to all actions involving fraud against the United States.... ”). Further, all but one court, United States v. Weaver, 107 F.Supp. 968, 966 (N.D.Ala.1952), rev’d on other grounds, 207 F.2d 796 (5th Cir.1953), to have considered the issue of whether the WSLA applies to civil claims have found that it applies. See, e.g., United States v. Witherspoon, 211 F.2d 858 (6th Cir.1954); United States ex rel. McCans v. Armour & Co., 146 F.Supp. 546 (D.D.C.1956); United States v. BNP Paribas, 884 F.Supp.2d 589 (S.D.Tex.2012).
Had Congress intended for “offense” to apply only to criminal offenses, it could have done so by not deleting the words “now indictable” or it could have replaced that phrase with similar wording. However, Congress did not include any limiting language and it is our opinion that in failing to do so it chose for the Act to apply to all offenses involving fraud against the United States. Therefore, because we find the text of the WSLA, the 1944 amendments, and the legislative history persuasive, we find that the WSLA applies to civil claims.
D.
The district court found that even if the WSLA was applicable to civil cases, it remains inapplicable to actions where the United States is not a party. The district court relied on this Court’s decision in United States ex rel. Sanders v. North American Bus Industries Inc., 546 F.3d 288 (4th Cir.2008), for support that the WSLA includes actions brought only by the United States. This Court held in Sanders that 31 U.S.C. § 3731(b)(2), a special statutory extension of the FCA’s statute of limitations, was available only to the government. Id. at 293. Sanders’s reasoning is further supported by the fact that the FCA has a statute of limitations that applies specifically to relators. 31 U.S.C. § 3731(b)(1). The limitations period in § 3731(b)(2) starts when the government knows or should know of “facts material to the right of action.” Sanders, 546 F.3d at 294 (quoting § 3731(b)(2)). The court reasoned:
This language makes perfect sense when referring to an action brought by the government: the limitations period is based on the government’s knowledge of ‘facts material to the right of action’ because that particular knowledge notifies the government that it has an actionable FCA claim. But applying the statute’s language to a relator’s action makes no sense whatsoever.
Id. at 294 (quoting § 3731(b)(2)). Unlike in Sanders, whether the suit is brought by the United States or a relator is irrelevant to this case because the suspension of limitations in the WSLA depends upon whether the country is at war and not who brings the case. As such the district court’s reliance on Sanders was misguided.
Courts are “authorized to deviate from the literal language of a statute only if the plain language would lead to absurd results, or if such an interpretation would defeat the intent of Congress.” Murkeldove v. Astrue, 635 F.3d 784, 793 (4th Cir.2011) (quoting Kornman & Assocs., Inc. v. United States, 527 F.3d 443, 451 (5th Cir.2008)) (internal quotation marks omitted). Sanders follows this logic, but this principle does not exclude relator-initiated actions from the ambit of the WSLA. Including such actions does not lead to “absurd results” nor “defeat the intent of Congress.” See id. In fact, including civil claims furthers the WSLA’s purpose: to root out fraud against the United States during times of war. See generally War *181 time Enforcement Fraud Act of 2008, S.Rep. No. 110-431, at 2-5. The district court’s reasoning for relying on Sanders was that if the WSLA applied to a relator’s claims this would “allow fraud [claims] to extend perhaps indefinitely.” This is incorrect. The WSLA tolls the applicable period for a specified and bounded time while the country is at war. By offering this rationale, it appears the court was critiquing the purpose of the WSLA itself and not providing a valid basis for excluding relator-initiated claims from the WSLA. Accordingly, we are unpersuaded that relator-initiated claims are excluded from the ambit of the WSLA. Thus, Carter’s action is not time barred.
IV.
We next consider KBR’s argument that the FCA’s first-to-file bar prohibits Carter’s case from proceeding.
A.
The FCA prescribes penalties for claims submitted to the government that are known to be false. While encouraging citizens to act as whistleblowers, the Act also seeks to prevent parasitic lawsuits based on previously disclosed fraud. See United States ex rel. St. John LaCorte v. Smith-Mine Beecham Clinical Labs., Inc., 149 F.3d 227, 233 (3d Cir.1998). To reconcile these conflicting goals, the FCA has placed jurisdictional limits on its qui tam provisions, including § 3730(b)(5)’s first-to-file bar and § 3730(e)(4)’s public disclosure provision.
Under the first-to-file bar, if Carter’s claims had been previously filed by another relator, then the district court lacked subject matter jurisdiction. By the same token, the public disclosure bar prevents a relator from bringing an action if the matters therein have already been made public knowledge, except if the person is an original source of the information. Although the provisions promote the same goals, they have different requirements. Here the district court ruled on the first-to-file bar and did not consider the public disclosure bar. Because of this, we begin with the first-to-file bar.
B.
KBR argues that Duprey and the Texas action are related actions that deprive this Court of jurisdiction under the first-to-file bar. This Court has described the first-to-file bar as an absolute, unambiguous exception-free rule. See United States ex rel. LaCorte v. Wagner, 185 F.3d 188, 191 (4th Cir.1999). Therefore, whoever wins the race to the courthouse prevails and the other case must be dismissed. The text of the relevant section provides that “[w]hen a person brings an action under [the FCA], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.” 31 U.S.C. § 3730(b)(5). Section 3730(b)(5) is jurisdictional and if an action is later filed that is based on the facts underlying the pending case, the court must dismiss the later case for lack of jurisdiction. See Walburn v. Lockheed Martin Corp., 431 F.3d 966, 970 (6th Cir.2005).
In determining whether a complaint is similar enough as to be caught by the first-to-file bar, courts have applied variations of a common approach. Although the approaches vary, courts have almost uniformly rejected an “identical facts” test on the ground that the provision refers to a “related” action rather than an “identical” action. The courts also agree that differences in specifics — such as geographic location or added facts — will not save a subsequent case. The Third, Fifth, Sixth, Ninth, Tenth, and D.C. circuits have all *182 adopted a “same material elements test.” United States ex rel. Lujan v. Hughes Aircraft Co., 243 F.3d 1181, 1183 (9th Cir.2011); United States ex rel. Branch Consultants v. Allstate Ins. Co., 560 F.3d 371, 378 (5th Cir.2009); Walburn, 431 F.3d at 971; Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279-1280 (10th Cir.2004); United States ex rel. Hampton v. Columbia/HCA Healthcare Corp., 318 F.3d 214, 217-218 (D.C.Cir.2003); LaCorte, 149 F.3d at 232-33.
Under this test, a later suit is barred if it is based upon the “same material elements of fraud” as the earlier suit, even though the subsequent suit may “incorporate somewhat different details.” Lujan, 243 F.3d at 1189. “[T]he test prevents the less vigilant whistle-blower from using insignificant factual variations to allege what is essentially the same fraudulent scheme already made known to the government.” United States ex rel. Folliard v. Synnex Corp., 798 F.Supp.2d 66, 73 (D.D.C.2011) (quoting United States ex rel. Batiste v. SLM Corp., 740 F.Supp.2d 98, 102 (D.D.C.2010)) (internal quotation marks omitted). We find our sister circuits’ reasoning persuasive, and we join these circuits in adopting the “material elements test.”
C.
We shall now apply the material elements test to determine whether Carter’s action is barred by either Duprey or the Texas action. The allegations in Du-prey, the Texas action, and herein are substantially similar. All allege that KBR had a systematic practice of overbilling the government for hours worked by their employees. The employees were instructed to complete their time sheets without regard to the number of hours that were actually worked. These allegations of fraud provide the government with enough knowledge of essential facts of the scheme to discover related fraud. The government would likely investigate billing practices across the company, because Duprey notes that the official national policy was to bill correctly but that the employees were consistently instructed not to do so.
Carter seeks to distinguish his action by pointing out that the other relators worked in different divisions and were truck drivers, whereas he was a ROWPU employee. We are unpersuaded that these distinctions are material. Duprey and the Texas action both allege a broad scheme that encompasses the time and location of Carter’s action. Even though the fraud did occur via different types of employees and in different divisions, this is insufficient to demonstrate that the scheme Carter alleges is different from the one Du-prey and the Texas relators allege. As the Fifth Circuit noted, “a relator cannot avoid § 3730(b)(5)’s first-to-file bar by simply adding factual details or geographic location to the essential or material elements of a fraud claim.... ” Branch Consultants, 560 F.3d at 378. Here the fraud alleged—submission of false time sheets in support of claims for false payment—is the same in all of the complaints. Thus, Section 3730(b)(5)’s goal of preventing parasitic qui tam lawsuits would not be furthered if all three actions were allowed to proceed on the same essential claims.
D.
Carter argues that regardless of the relatedness of his complaint to the other cases, the other cases cannot continue to have a preclusive effect on his action. Carter argues that because the Duprey and Texas action have been dismissed neither can be deemed a “pending action” under § 3730(b)(5).
*183 Following the plain language of the fírst-to-file bar, Carter’s action will be barred by Duprey or the Texas action if either case was pending when Carter filed suit. The Duprey action was filed in 2007, and voluntarily dismissed in October 2011, after the relator failed to serve the complaint on the defendants. The Texas action was filed in 2007 and voluntarily dismissed in March 2012, when the government declined to intervene. Therefore, both actions were pending when Carter filed his complaint on June 2, 2011. Because we look at the facts as they existed when the claim was brought to determine whether an action is barred by the first-to-file bar, we conclude that Carter’s claims are barred by the Duprey and Texas actions. However, this does not end our inquiry.
Carter alleges that the district court erred when it dismissed his complaint with prejudice on the ground that his action was forever barred by the Duprey action. In United States ex rel. Chovanec v. Apria Healthcare Group, Inc., 606 F.3d 361, 365 (7th Cir.2010), the Seventh Circuit reviewed a complaint that was dismissed with prejudice because of a pending case. The court reasoned that once the initial complaint was no longer pending, the bar of § 3730(b)(5) was inapplicable and Chovanec was “entitled to file a new qui tarn complaint.” Id. at 365. However, if a case is brought while the original ease is pending it must be dismissed “rather than left on ice.” Id. at 362. Although the doctrine of claim preclusion may prevent the filing of subsequent cases, § 3730(b)(5) does not. This is especially true when the original case is dismissed on reasons other than the merits or dismissed without prejudice. Id. at 362. Because Chovanec was entitled to file a new complaint, the proceeding should have been dismissed without prejudice. Id. at 365.
Similarly the Tenth Circuit has explained why an action that is no longer pending cannot have a preclusive effect for all future claims. In re Natural Gas Royalties Qui Tam Litig., 566 F.3d 956, 963-64 (10th Cir.2009). The court reasoned, “if that prior claim is no longer pending, the first-to-file bar no longer applies.” Id. at 964. “The ‘pending’ requirement much more effectively vindicates the goal of encouraging relators to file; it protects the potential award of a relator while his claim remains viable, but, when he drops his action another relator ... may pursue his own.” Id.
We agree that once a case is no longer pending the first-to-file bar does not stop a relator from filing a related case. In this case, both of the original actions have been dismissed. Because of this, the first-to-file bar does not preclude Carter from filing an action. The first-to-file bar allows a plaintiff to bring a claim later; this is precisely what a dismissal without prejudice allows a plaintiff to do as well. Therefore, Carter’s only impediment at the moment is the district court’s dismissal with prejudice. And, as we have already concluded the district court erred in dismissing Carter’s complaint with prejudice.
V.
KBR argues that this Court should affirm the dismissal of Carter’s complaint on the alternative ground of the FCA’s public disclosure provision. As noted previously, the public disclosure bar removes subject matter jurisdiction for FCA claims that are based upon matters that have been disclosed publicly, unless the relator was the original source of the allegations. KBR alleges that Carter was not the original source of the information, *184 and that he gathered the information from another KBR employee. The district did not reach this argument, having found grounds for dismissal elsewhere. We decline to address this issue for the first time on appeal. Because the district court should have the opportunity in the first instance to address the facts relevant to public disclosure, we remand this issue to the district court.
VI.
For the foregoing reasons we reverse the district court’s dismissal of Carter’s complaint. Rather than address the alternative ground of the public disclosure bar for the first time on appeal, we remand this issue to the district court for further consideration.

REVERSED AND REMANDED