[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-11998

_____

D.C. Docket No. 0:13-cr-60045-RNS-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEVEN FREDIANI,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 22, 2015)

Before WILLIAM PRYOR, JULIE CARNES, and SILER,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

This appeal requires us to decide whether hostilities related to the use

military of force against terrorists and Iraq, as authorized by Congress, have

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by
designation.

"terminat[ed]" under the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287. Seven years after Steven Frediani committed the crimes, a federal grand jury indicted him on one count of conspiracy to commit aircraft parts fraud, *id.* §§ 38(a)(1)(C), (a)(3), and two substantive counts of aircraft parts fraud, *id.* § 38(a)(1)(C). Frediani moved to dismiss the substantive counts of the indictment as untimely, *id.* § 3282(a). The district court denied his motion because, when Congress authorized the "use of the Armed Forces," the Act tolled the statute of limitations for frauds against the United States until the "termination of hostilities as proclaimed by a Presidential Proclamation, with notice to Congress, or by a concurrent resolution of Congress," *id.* § 3287. On appeal, Frediani argues that the "hostilities" related to the "use of the Armed Forces" "terminat[ed]" over a decade ago, *id.*, so the Act does not toll the statute of limitations for his crimes. Frediani also argues that the district court abused its discretion when it admitted "other act" evidence under Federal Rule of Evidence 404(b). Because the plain language of the Act requires a Presidential proclamation or a concurrent resolution of Congress to end the tolling of the limitations period and the district court did not abuse its discretion when it admitted the "other act" evidence, we affirm Frediani's convictions.

2

## I. BACKGROUND

Glenn Nichols served as the president and chief executive officer of InstoComp, Inc., and Frediani served as its sales manager. InstoComp submitted bids for contracts with the Department of Defense that involved the sale of microcircuits for military aircraft. Nicholas and Frediani ran the day-to-day operations at InstoComp.

In 2005, InstoComp submitted a bid for a contract to supply microcircuits to the Defense Supply Center in Columbus, Ohio. The Supply Center requested a certification that the parts met specifications and were traceable to the manufacturer. In February 2006, Nichols sent a counterfeit certificate of conformance that purportedly came from a supplier called Zilog, Inc. The Supply Center then awarded the contract to InstoComp.

Also in February 2006, InstoComp submitted a bid for another contract to sell microcircuits to the Supply Center, supposedly by procuring the parts from a company called Microsemi. The Supply Center again requested a certificate of conformance from InstoComp. Nichols again sent a counterfeit certificate.

On one occasion when InstoComp won a contract to provide a specific part from a specific vendor, that vendor notified the Supply Center that it was impossible for InstoComp to provide the parts at the price that InstoComp had quoted the government. The Supply Center notified the Defense Criminal

Investigate Service, which began to investigate the contracts that InstoComp had been awarded. The Service found that parts supplied by InstoComp failed tests and were nonconforming.

The Service interviewed Frediani, who admitted that he had produced counterfeit certificates that Nichols then sent to the Supply Center. Frediani also provided the Service with electronic chat logs in which he and Nichols discussed their counterfeiting process. The Service conducted a warranted search of Frediani's home and found copies of fraudulent certificates. During the search, Frediani admitted that he knew that Nichols sent the counterfeits to the government. He also admitted that he knew that the parts InstoComp provided to the government were not always the approved parts.

In February 2013, a federal grand jury returned a three count indictment against Frediani and Nichols for conspiracy to commit aircraft parts fraud, 18 U.S.C. §§ 38(a)(1)(C), (a)(3), and two substantive counts of aircraft parts fraud, *id.* § 38(a)(1)(C). Nichols signed a plea agreement, but Frediani moved to dismiss the substantive counts of the indictment on the ground that the statute of limitations for those crimes had expired. He argued that, because the crimes occurred over seven years before the indictment, the indictment was not returned within the five-year statute of limitations for federal crimes, *id.* § 3282. The government responded that the Wartime Suspension of Limitations Act, *id.* § 3287, tolled the period of

limitations until five years after the cessation of hostilities in Iraq and Afghanistan, which neither the President nor Congress had yet proclaimed. The district court denied Frediani's motion.

Before trial, the government filed a notice of intent to introduce evidence of 34 other contracts awarded to InstoComp where the military received non-conforming parts. The government asserted that the evidence was "inextricably intertwined" with evidence of the conspiracy and that, in the alternative, it was admissible under Federal Rule of Evidence 404(b). Frediani moved *in limine* to exclude the evidence on the basis that it was unfairly prejudicial. The district court denied the motion on the condition that the government lay a "foundation" for the evidence. Notwithstanding that ruling, the parties agreed that the government would not introduce any of the contracts that did not include a counterfeit certificate.

At trial, Richard Intemann, an electronics technician for the Defense Logistics Agency, testified that he had tested products InstoComp provided to the Supply Center, that the products were not the ones the government had requested, and that the products failed the tests. On cross-examination, counsel for Frediani attempted to establish that someone without electronics expertise might make a mistake when selling parts to the government:

> Q: And you have been an expert in testing electronics for nearly 30 plus years, correct?

A. Yes.

Q. So a standard—or a person who's just looking to supply aircraft parts might not have the expertise that you have; isn't that correct?

A. It is possible.

Q. Okay.

A. But he should know what he's selling.

Q. Well, but a person could make a mistake and sell a part that's nonconforming under the stock number; isn't that correct?

. . .

[A.] An 855, that's the SMD, standard microcircuit drawing that requires traceability. So you have to, you know, confirm what you're giving [the Defense Logistics Agency] before you do it. And I'm sure, without even looking at the contract, that that's the part number that's in the contract because that's the item that you want.

Q. Right.

A. And before you do that, you have to revert [sic] to the Government that you're supplying a 551702. You don't have the right to substitute another part number. I mean, if you're that confused, you shouldn't be doing business with the Government.

Q. Well, that would be a mistake of stupidity, right, and not intent or fraud, would it?

The district court sustained an objection to that question.

Before redirect examination, the government informed the district court at a sidebar that, to respond to Frediani's argument about mistake, it would now offer evidence about six of the additional contracts it had previously agreed not to

6

introduce. The district court admitted the evidence because Frediani had "opened the door." On redirect examination, Intemann testified about six additional shipping orders from InstoComp to the Supply Center that he had personally inspected where the wrong part had been supplied to government.

The jury found Frediani guilty on all counts. The district court sentenced Frediani to 18 months of imprisonment, followed by three years of supervised release. The district court also ordered Frediani to pay $229,494.24 in restitution to the government.

## II. STANDARDS OF REVIEW

This appeal is governed by two standards of review. First, we review *de novo* "the district court's interpretation and application of the statute of limitations." *United States v. Palomino Garcia*, 606 F.3d 1317, 1322 (11th Cir. 2010) (internal quotation marks and citation omitted). Second, "[w]e review a district court's evidentiary rulings for an abuse of discretion." *United States v. Eckhardt*, 466 F.3d 938, 946 (11th Cir. 2006). "An erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless." *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999), *corrected by* 194 F.3d 1186 (11th Cir. 1999).

7

### III. DISCUSSION

We divide our discussion in two parts. First, we explain that the indictment was timely because the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287, tolled the statute of limitations for Frediani's crimes. Second, we explain that the district court did not abuse its discretion when it admitted evidence about other fraudulent transactions.

*A. The Wartime Suspension of Limitations Act Tolled the Statute of Limitations for Frediani's Substantive Offense.*

Frediani argues that the substantive counts of the indictment should have been dismissed as untimely, but his argument fails. "Except as otherwise expressly provided by law," the ordinary statute of limitations for non-capital federal crimes is five years. 18 U.S.C. § 3282(a). But the Wartime Suspension of Limitations Act provides an exception to that general rule when the Nation is at war:

> When the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution, the running of any statute of limitations applicable to any offense . . . involving fraud . . . against the United States or any agency thereof . . . by conspiracy or not . . . shall be suspended until 5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress.

*Id.* § 3287 (internal citation omitted). Because Congress authorized "the use of the Armed Forces" in response to the terrorist attacks of September 11, 2001, *see* Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001),

8

and for the invasion of Iraq, *see* Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498, and those hostilities have not yet "terminat[ed]," 18 U.S.C. § 3287, the indictment is timely.

Frediani does not contest that Congress twice authorized the use of military force as required by the Act, but he contends that those hostilities have "terminat[ed]." Frediani cites *United States v. Prosperi* for the proposition that the 2001 authorization terminated on December 22, 2001, when the "United States formally recognized and extended full diplomatic relations to the new government of Hamid Karzai," and the 2002 authorization terminated on May 1, 2003, when "President Bush . . . proclaimed that '[m]ajor combat operations in Iraq have ended.'" 573 F. Supp. 2d 436, 455 (D. Mass. 2008); *see also United States v. Pearson*, No. 2:09CR43-KS-MTP, 2010 WL 3120038, at \*2 (S.D. Miss. Aug. 4, 2010) (adopting reasoning of *Prosperi*). In *Prosperi*, the district court opined that it was "incumbent on the court" to "identify a clear demarcation point at which the tolling provisions" of the Act cease. 573 F. Supp. 2d at 454.

Frediani's argument fails. The plain language of the Act provides that the "termination of hostilities" is determined by "a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress." 18 U.S.C. § 3287. It is not "incumbent on [our C]ourt," *Prosperi*, 573 F. Supp. 2d at 454, to demarcate the end of hostilities. The statute makes clear that the political branches

must make that determination. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 *(*2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). Moreover, that requirement of judicial deference to the branches that have the power to declare and wage war makes sense. And Frediani has pointed to no concurrent resolution of Congress, nor any Presidential proclamation accompanied by notice to Congress, that the hostilities have terminated under either authorization of military force. A Presidential proclamation must be published in the Federal Register, 44 U.S.C. § 1505(a)(1), as President Truman did in 1946 to mark the end of World War II, *see United States v. Grainger*, 346 U.S. 235, 246, 73 S. Ct. 1069, 1075 (1953) (citing 3 C.F.R. § 77–78 (1946 Supp.)) (holding that the tolling of the statute of limitations ends on the date of the Presidential proclamation). No President has issued such a proclamation here.

The only two other circuit courts to have addressed this issue agree that the plain language of the Act controls. In *United States v. Pfluger*, the Fifth Circuit explained that, "[w]hen interpreting a statute, we are bound to follow the plain and unambiguous meaning of the statutory language[, and] . . . the plain and unambiguous language of the [Act] mandates formal requirements for the termination clause to be met." 685 F.3d 481, 485 (5th Cir. 2012) (internal quotation marks and citation omitted). And in *United States ex rel. Carter v.*

10

*Halliburton Co.*, the Fourth Circuit explained that the Act "specif[ies] that termination shall not occur until the Act's formalities have been met." 710 F.3d 171, 179 (4th Cir. 2013), *aff'd in part*, *rev'd in part sub nom. Kellog Brown & Root Servs., Inc. v. U.S. ex rel Carter*, __ U.S. __, __ S. Ct. __, No. 12-1497 (May 26, 2015). Because "[n]either Congress nor the President had met the formal requirements of the Act for terminating the period of suspension," the court concluded that the Act continued to apply. *Id.*

Frediani also argues that "adoption of the Government's position is a poor public policy decision" because it would lead to "indefinite tolling" of the statute of limitations. Frediani asserts that, "due to the asymmetrical nature of the 'War on Terror,' the United States will forever be engaged in small conflicts across the globe." This consideration is irrelevant to our review. The text of the statute is clear, and whether the policy leads to good outcomes has no bearing on our decision. *See, e.g.*, *Yates v. United States*, __ U.S. __, __, 135 S. Ct. 1074, 1101 (2015) (Kagan, J., dissenting) ("If judges disagree with Congress's choice, we are perfectly entitled to say so—in lectures, in law review articles, and even in dicta. But we are not entitled to replace the statute Congress enacted with an alternative of our own design."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 352–54 *(*2012) (explaining the error in relying on consequentialism in statutory interpretation).

11

## B. The District Court Did Not Abuse Its Discretion When It Admitted Evidence of Frediani's Other Frauds.

Frediani next argues that the district court abused its discretion when it admitted evidence of six additional fraudulent contracts that were not charged in the indictment, but this argument fails too. Frediani made his intent an issue during trial, and the district court did not abuse its discretion when it allowed the government to rebut Frediani's implication that he had made a mistake. And even if the district court had abused its discretion, the error was harmless.

Federal Rule of Evidence 404(b) provides that "[e]vidence of a crime, wrong or other act" is not admissible to prove a person's character but is admissible for "another purpose, such as proving . . . intent . . . [or] absence of mistake." Fed. R. Evid. 404(b). For evidence of other crimes to be admissible, the evidence must "be relevant to an issue other than defendant's character; . . . there must be sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; . . . the probative value of the evidence cannot be substantially outweighed by undue prejudice, and the evidence must satisfy Rule 403." *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007).

The disputed evidence satisfies each of the requirements of Rule 404(b). A "defendant who enters a not guilty plea makes intent a material issue . . . ." *United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir. 1998). The government "may prove [intent] by qualifying Rule 404(b) evidence absent affirmative steps by the

12

defendant to remove intent as an issue." *Id*. And a defendant's "knowing

commission" of other, similar crimes "logically bear[s] on his knowledge" of the

crimes charged in the indictment. *United States v. Jernigan*, 341 F.3d 1273, 1281

(11th Cir. 2003). The government was required to prove intent, and that necessity

became all the more important when Frediani implied that he had only made a

mistake. And Frediani has not asserted that the evidence failed to meet any other

requirement of Rules 404(b) or 403.  We cannot say that the district court abused

its "broad discretion," *Zapata*, 139 F.3d at 1357, when it admitted the evidence.

Even if the evidence should not have been admitted, the error was harmless.

An evidentiary error "is harmless unless there is a reasonable likelihood that [it]

affected the defendant's substantial rights. We need not reverse [Frediani]'s

conviction if the error had no substantial influence on the outcome and sufficient

evidence uninfected by error supports the verdict." *Hands*, 184 F.3d at 1329

(internal quotation marks and citations omitted). Overwhelming evidence

established that Frediani defrauded the government:  Frediani admitted to the

investigating agent that he created the counterfeited documents and that he knew

Nichols would send them to the government; there were physical copies of the

counterfeits in his home; Frediani provided investigators with electronic

communications between Nichols and he, in which they discussed their frauds; and

numerous witnesses provided uncontested testimony that the documentation for the relevant orders was fraudulent.

## IV. CONCLUSION

We **AFFIRM** Frediani's convictions.