<u>**PUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1035**

UNITED STATES OF AMERICA ex rel. PATRICK GERARD CARSON,

        Plaintiff – Appellant,

    and

UNITED STATES OF AMERICA ex rel. CHRISTINE A. RIBIK,

        Plaintiff,

        v.

MANOR CARE, INCORPORATED, a/k/a HCR Manor Care, Inc., d/b/a HCR Manor Care; HCR MANOR CARE; HEARTLAND EMPLOYMENT SERVICES, LLC,

        Defendants – Appellees,

    and

MANOR CARE - FAIR OAKS OF FAIRFAX VA, LLC, d/b/a Manorcare Health Services - Fair Oaks; MANOR CARE OF ARLINGTON VA, LLC, d/b/a Manorcare Health Services - Arlington; MANOR CARE OF NORTH HILLS OF PITTSBURGH PA, LLC, a/k/a ManorCare Health Services - North Hills; MANOR CARE OF POTTSTOWN, PA, LLC, a/k/a ManorCare Health Services - Pottstown; MANOR CARE OF POTTSVILLE PA, LLC, a/k/a ManorCare Health Services - Pottsville; MANOR CARE OF SINKING SPRING PA, LLC, a/k/a ManorCare Health Services - Sinking Spring; MANOR CARE OF SUNBURY PA, LLC, a/k/a ManorCare Health Services - Sunbury; MANOR CARE OF WEST READING PA, LLC, a/k/a ManorCare Health Services - West Reading North; MANOR CARE OF WHITEHALL BOROUGH PA, LLC, a/k/a ManorCare Health Services - Whitehall Borough; MANOR CARE OF WILLIAMSPORT PA (SOUTH), LLC, a/k/a ManorCare Health Services - Williamsport South; MANOR CARE OF YARDLEY PA, LLC, a/k/a ManorCare Health Services - Yardley;

MANOR CARE OF YEADON PA, LLC, a/k/a ManorCare Health Services - Yeadon; MANOR CARE OF YORK (NORTH) INC., a/k/a Manor Care - North, a/k/a ManorCare Health Services - York North; MANOR CARE OF YORK (SOUTH) INC., a/k/a Manor Care - South, a/k/a ManorCare Health Services - York South; MANOR CARE OF CHARLESTON, INC., a/k/a HCR ManorCare Health Services - Charleston, a/k/a Manor Care, Incorporated; MANOR CARE OF COLUMBIA, INC., a/k/a HCR Manor Care - Columbia, a/k/a Manor Care, Incorporated; MANOR CARE OF LEXINGTON, INC., a/k/a Manor Care Nursing and Rehab Center, a/k/a Manor Care, Incorporated; MANOR CARE OF ABERDEEN SD, LLC, a/k/a ManorCare Health Services - Aberdeen; MANOR CARE OF TENNESSEE, INC.; MANOR CARE OF DALLAS TX, LLC, a/k/a ManorCare Health Services - Dallas; MANOR CARE OF FORTH WORTH TX, LLC, a/k/a ManorCare Health Services - Fort Worth; MANOR CARE OF HOUSTON TX, LLC, a/k/a ManorCare Health Services - Houston, a/k/a ManorCare Health Services - Sharpview; MANOR CARE OF NORTH RICHLAND HILLS TX, LLC, a/k/a ManorCare Health Services - North Richland Hills; MANOR CARE OF SAN ANTONIO TX, LLC; MANOR CARE OF WEBSTER TX, LLC; MANOR CARE OF ALEXANDRIA VA, LLC; MANOR CARE OF IMPERIAL (RICHMOND VA), LLC; MANOR CARE OF STRATFORD HALL (RICHMOND VA), LLC; MANOR CARE HEALTH SERVICES OF WASHINGTON INC.; MANOR CARE OF GIG HARBOR WA, LLC; MANOR CARE OF LYNWOOD WA, LLC; MANOR CARE OF TACOMA WA, LLC; MANOR CARE OF APPLETON WI, LLC; MANOR CARE OF FOND DU LAC WI, LLC; MANOR CARE OF GREEN BAY WI (EAST), LLC; MANOR CARE OF KENOSHA WI, LLC; MANOR CARE OF PEWAUKEE WI, LLC; CARLYLE GROUP, a/k/a Carlyle - Manorcare; CARLYLE MC PARNERS, L.P.; CARLYLE PARTNERS V MC, L.P.; MANORCARE HEALTH SERVICES OF ARIZONA, INC.; HEATHER MANOR CARE CENTER, INC., a/k/a Heather Manor Nursing and Rehab Center; STELLA MANOR CARE CENTER, INC.; MANOR CARE OF CALIFORNIA INC.; BROADWAY MANOR CARE CENTER, INC.; CARLYLE PARTNERS, LLC; CARLYLE GROUP LLC; DESERT MANOR CARE CENTER LP; FREDERICKA MANOR CARE CENTER, INC.; KINGSLEY MANOR CARE CENTER, INC.; MANOR CARE OF CITRUS HEIGHTS CA, LLC; MANOR CARE OF FOUNTAIN VALLEY CA, LLC; MANOR CARE OF SUNNYVALE CA, LLC; MANOR CARE OF HEMET CA, LLC; MANOR CARE OF PALM DESERT CA, LLC; MANOR CARE HEALTH SERVICES - TICE VALLEY; MANOR CARE OF RANCHO BERNARDO CA, LLC; PINE MANOR CARE HOME, INC.; PLEASANT MANOR CARE HOMES, INC.; WALNUT MANOR CARE CENTER, INC.; VALENCIA MANOR CARE, INC.; VILLA MANOR CARE CENTER, INC.; ASHLEY MANOR CARE CENTERS, INC.; BERKLEY MANOR CARE CENTER, INC.; CCF - MANOR CARE, LLC; COLUMBINE MANOR CARE CENTER, INC.; GRACE MANOR CARE CENTER, a/k/a

2

Burlington Nursing Home, LLC; HRC MANOR CARE MEDICAL SERVICES OF FLORIDA, INC.; LAUREL MANOR CARE CENTER, INC.; MANOR CARE HEALTH SERVICES - BOULDER, a/k/a Manorcare Health Services, Incorporated, f/k/a ManorCare Health Services of Colorado; MANOR CARE HEALTH SERVICES - DENVER, a/k/a Manorcare Health Services, Incorporated; VALLEY MANOR CARE CENTER, INC.; WHEATRIDGE MANOR CARE CENTER; PILGRIM MANOR CARE CENTER, INC.; WESTFIELD MANOR CARE CENTER, INC.; MANOR CARE HEALTH SERVICES - PIKE CREEK; MANOR CARE HEALTH SERVICES - WILMINGTON; MANOR CARE OF BOCA RATON, INC., a/k/a Manor Care of Boca Raton FL, LLC; MANOR CARE OF BOYNTON BEACH, INC., a/k/a ManorCare Services of Boynton Beach FL, LLC; MANOR CARE OF BREVARD, INC.; MANOR CARE OF BROWARD, INC.; MANOR CARE - CARROLLWOOD OF TAMPA FL, LLC, a/k/a ManorCare Health Services-Carrollwood of Tampa Florida; MANOR CARE OF DELRAY BEACH FL, LLC, a/k/a ManorCare Health Services - Delray; MANOR CARE OF DUNEDIN FL, LLC; MANOR CARE OF FORT MYERS, INC., a/k/a ManorCare Health Services of Fort Myers, Inc.; MANOR CARE - LELY PALMS OF NAPLES FL (SH), LLC; MANOR CARE OF PALM HARBOR FL, LLC, a/k/a ManorCare Health Services - Palm Harbor; MANOR CARE OF PLANTATION, INC., a/k/a ManorCare Health Services of Plantation, Inc.; MANOR CARE OF SARASOTA, INC., a/k/a ManorCare Nursing Center of Sarasota FL, LLC; MANOR CARE OF VENICE FL, LLC; MANOR CARE OF WEST PALM BEACH FL, LLC, a/k/a ManorCare Health Services - West Palm Beach; MANOR CARE OF WINTER PARK FL, LLC, a/k/a ManorCare Health Services - Winter Park; MANOR CARE HEALTH SERVICES OF GEORGIA, INC.; GCI VALLEY MANOR CARE HEALTH CENTER; MANOR CARE OF COVINGTON, LLC; MANOR CARE OF MARIETTA GA, LLC, a/k/a ManorCare of Marietta Nursing and Rehab; MANOR CARE REHABILITATION CENTER OF DECATUR GA, LLC, a/k/a ManorCare Nursing and Rehab Center - Decatur, a/k/a ManorCare Health Services - Decatur; MANOR CARE OF ARLINGTON HEIGHTS IL, LLC, a/k/a ManorCare Health Services - Arlington Heights; MANOR CARE OF CHAMPAIGN IL, LLC, a/k/a ManorCare Health Services - Champaign; MANOR CARE OF ELGIN IL, LLC; MANOR CARE OF ELK GROVE VILLAGE IL, LLC, a/k/a ManorCare Health Services - Elk Grove Village; MANOR CARE OF HIGHLAND PARK IL, LLC, a/k/a ManorCare of Highland Park; MANOR CARE OF HINSDALE IL, LLC, a/k/a ManorCare of Hinsdale; MANOR CARE OF HOMEWOOD IL, LLC, a/k/a ManorCare Health Services - Homewood; MANOR CARE OF KANKAKEE IL, LLC, a/k/a ManorCare Health Services - Kankakee; MANOR CARE OF LIBERTYVILLE IL, LLC, a/k/a ManorCare Health Services - Libertyville; MANOR CARE OF NAPERVILLE IL, LLC, a/k/a ManorCare Health Services - Naperville; MANOR CARE OF NORTHBROOK IL, LLC, a/k/a ManorCare Health Services - Northbrook; MANOR CARE OF OAK LAWN (EAST) IL, LLC, a/k/a ManorCare

3

Health Services - Oak Lawn East; MANOR CARE OF OAK LAWN (WEST) IL, LLC; MANOR CARE HEALTH SERVICES - SKOKIE IL; MANOR CARE OF PALOS HEIGHTS (EAST) IL, LLC; MANOR CARE OF PALOS HEIGHTS (WEST) IL, LLC; MANOR CARE OF ROLLING MEADOWS IL, LLC; MANOR CARE OF SOUTH HOLLAND IL, LLC; MANOR CARE OF WESTMONT IL, LLC; MANOR CARE OF WILMETTE IL, LLC; RUTLEDGE MANOR CARE HOME, INC.; MANOR CARE - ANDERSON, INDIANA; MANOR CARE OF PRESTWICK AVON IL, LLC, a/k/a ManorCare Health Services - Prestwick; MANOR CARE HEALTH SERVICES - SUMMER TRACE; MANOR CARE HEALTH SERVICES - INDY SOUTH; MANOR CARE OF CEDAR RAPIDS IA, LLC, a/k/a ManorCare Health Services- Cedar Rapids; MANOR CARE OF DAVENPORT IA, LLC, a/k/a ManorCare Health Services - Davenport; MANOR CARE OF DUBUQUE IA, LLC, a/k/a ManorCare Health Services - Dubuque; MANOR CARE OF WATERLOO IA, LLC, a/k/a ManorCare Health Services - Waterloo; MANOR CARE OF WEST DES MOINES IA, LLC, a/k/a ManorCare Health Services - West Des Moines; MANOR CARE OF UTICA RIDGE IA, LLC, a/k/a ManorCare Health Services - Utica Ridge; GREENWOOD MANORCARE CENTER, INC.; LINN MANORCARE CENTER, INC.; NORTHBROOK MANORCARE CENTER, INC.; TABOR MANORCARE CENTER INC.; MANORCARE HEALTH SERVICES OF KANSAS INC.; MANOR CARE OF OVERLAND PARK KANSAS, LLC, a/k/a ManorCare Health Services - Overland Park; MANOR CARE OF WICHITA KANSAS, LLC, a/k/a ManorCare Health Services - Wichita; MANORCARE OF KENTUCKY, INC.; MANORCARE OF MT. HOLLY, INC.; WOODCREST MANOR CARE CENTER, INC.; MANORCARE OF ST. MATTHEWS MANOR, INC.; MANORCARE HEALTH SERVICES - BETHESDA, a/k/a Manor Care of Bethesda MD, LLC, f/k/a Manor Care of Bethesda Inc.; MANORCARE HEALTH SERVICES - CHEVY CHASE, a/k/a Manor Care of Chevy Chase MD, LLC; MANORCARE HEALTH SERVICES - DULANEY, a/k/a Manor Care - Dulany MD, LLC; MANORCARE FOUNDATION INC., a/k/a HCR ManorCare Foundation Inc.; MANORCARE HEALTH SERVICES - LARGO, a/k/a Manor Care of Largo MD, LLC, f/k/a Manor Care of Largo Inc.; MANORCARE HEALTH SERVICES - POTOMAC, a/k/a Manor Care of Potomac MD, LLC; MANORCARE HEALTH SERVICES - ROLAND PARK, a/k/a Manor Care - Roland Park; MANORCARE HEALTH SERVICES - ROSSVILLE, a/k/a Manor Care - Rossville MD, LLC; MANORCARE HEALTH SERVICES - RUXTON, a/k/a Manor Care Ruxton MD, LLC; MANORCARE HEALTH SERVICES - SILVER SPRING, a/k/a Manor Care of Silver Spring MD, LLC; MANORCARE HEALTH SERVICES - TOWSON, a/k/a Manor Care of Towson, LLC; MANORCARE HEALTH SERVICES - WHEATON, a/k/a Manor Care of Wheaton MD, LLC; MANORCARE HEALTH SERVICES - WOODBRIDGE VALLEY; ARBOR MANOR CARE CENTER, INC.; COUNTRY MANOR CARE CENTER, INC.; MANORCARE NURSING AND REHABILITATION CENTER; COLUMBIA

MANOR CARE CENTER, INC.; GRANDVIEW MANOR CARE CENTER, INC.; KIRKSVILLE MANOR CARE CENTER, INC.; LABELLE MANOR CARE CENTER, INC.; MANORCARE HEALTH SERVICES - FLORISSANT, a/k/a Manor Care of Florissant MO, LLC; MANORCARE HEALTH SERVICES - SPRINGFIELD, a/k/a Manor Care of Springfield MO, LLC; REDWOOD MANOR CARE CENTER, INC.; MANORCARE HEALTH SERVICES - RENO, a/k/a Manor Care of Reno NV, LLC; MANORCARE HEALTH SERVICES - WINGFIELD HILLS, a/k/a Manor Care of Wingfield Hills NV, LLC; RIVERVIEW MANOR CARE CENTER, INC.; KING MANOR CARE AND REHABILITATION CENTER, INC.; MANORCARE HEALTH SERVICES - CHERRY HILL, a/k/a Manor Care of Cherry Hill NJ, LLC; MANORCARE HEALTH SERVICES - MOUNTAINSIDE; MANORCARE HEALTH SERVICES - NEW PROVIDENCE, a/k/a Manor Care of New Providence NJ, LLC; MANORCARE HEALTH SERVICES - VOORHEES, a/k/a Manor Care of Voorhees NJ, LLC; MANORCARE HEALTH SERVICES - WASHINGTON TOWNSHIP, a/k/a Manor Care of Washington Township NJ, LLC; MANORCARE HEALTH SERVICES - WEST DEPTFORD, a/k/a Manor Care of West Deptford NJ, LLC; STRATFORD MANOR CARE AND REHABILITATION CENTER, INC.; MANORCARE HEALTH SERVICES - PINEHURST, a/k/a Manor Care of Pinehurst, Inc., a/k/a Manor Care of Pinehurst NC, LLC; MANOR CARE OF FARGO ND, LLC, a/k/a ManorCare Health Services - Fargo; MANOR CARE OF MINOT ND, LCL, a/k/a ManorCare Health Services - Minot; HRC MANORCARE PROPERTIES, LLC; HRC MANOR CARE FOUNDATION INC.; HILLCREST MANOR CARE CENTER, INC.; MANOR CARE OF AMERICA, INC.; MANOR CARE OF AKRON OH, LLC, a/k/a ManorCare Health Services - Akron; MANOR CARE - BELDEN VILLAGE OF CANTON OH, LLC, a/k/a ManorCare Health Services - Belden Village of Canton; MANORCARE HEALTH SERVICES - BARBERTON; MANOR CARE OF CENTERVILLE, INC., a/k/a Heartland of Centerville, a/k/a HRC ManorCare - Centerville; MANOR CARE - EUCLID BEACH OF CLEVELAND OH, LLC, a/k/a ManorCare Health Services - Euclid Beach; MANORCARE SERVICES - LAKE SHORE, a/k/a Manor Care at Lake Shore; MANOR CARE MT. AIRY, a/k/a Heartland of Mt. Airy; MANOR CARE OF MAYFIELD HEIGHTS OH, LLC, a/k/a ManorCare Health Services - Mayfield Heights; MANOR CARE OF NORTH OLMSTEAD OH, LLC, a/k/a ManorCare Health Services - North Olmstead; MANOR CARE OF PARMA OH, LLC, a/k/a ManorCare Health Services - Parma; MANOR CARE PROPERTIES, INC.; MANORCARE HEALTH SERVICES - ROCKY RIVER, a/k/a Manor Care of Rocky River OH, LLC; MANOR CARE AT SYCAMORE GLENN; MANOR CARE OF WESTERVILLE OH, LLC, a/k/a ManorCare Health Services - Westerville; MANOR CARE OF WILLOUGHBY OH, LLC, a/k/a ManorCare Health Services - Willoughby; OAKHILL MANOR CARE CENTER, INC.DEF; PICKAWAY MANOR CARE CENTER, INC.; MANOR CARE OF MIDWEST CITY OK,

LLC, a/k/a ManorCare Health Services - Midwest City; MANOR CARE OF OKLAHOMA CITY (NORTHWEST), LLC, a/k/a ManorCare Health Services - Northwest; MANOR CARE OF OKALAHOMA CITY (SOUTHWEST), LLC, a/k/a ManorCare Health Services - Southwest; MANOR CARE OF TULSA OK, LLC, a/k/a ManorCare Health Services - Tulsa; DEVON MANOR CORPORATION, a/k/a Manor Care at Devon; MANOR CARE OF ALLENTOWN PA, LLC, a/k/a ManorCare Health Services - Allentown; MANOR CARE OF BETHEL PARK PA, LLC, a/k/a ManorCare Health Services - Bethel Park; MANOR CARE OF BETHLEHEM PA (2021), LLC, a/k/a ManorCare Health Services - Bethlehem (2021); MANOR CARE OF BETHLEHEM PA (2029), LLC, a/k/a ManorCare Health Services - Bethlehem (2029); MANOR CARE OF CAMP HILL PA, LLC, a/k/a ManorCare Health Services - Camp Hill; MANOR CARE OF CARLISLE PA, LLC, a/k/a ManorCare Health Services - Carlisle; MANOR CARE OF CHAMBERSBURG PA, LLC, a/k/a ManorCare Health Services - Chambersburg; MANOR PARK OF DALLASTOWN PA, LLC, a/k/a ManorCare Health Services - Dallastown, a/k/a ManorCare Health Services - Camp Hill; MANOR CARE OF EASTON PA, LLC, a/k/a ManorCare Health Services - Easton; MANOR CARE OF ELIZABETHTOWN, LLC, a/k/a ManorCare Health Services - Elizabethtown; MANOR CARE - GREENTREE OF PITTSBURGH PA, LLC, a/k/a ManorCare Health Services - Greentree; MANOR CARE HEALTH SERVICES - HARRISBURG, a/k/a Manor Healthcare Corp.; MANOR CARE OF HUNTINGDON VALLEY PA, LLC, a/k/a ManorCare Health Services - Huntington Valley; MANOR CARE OF JERSEY SHORE PA, LLC, a/k/a ManorCare Health Services - Jersey Shore; MANOR CARE KING OF PRUSSIA PA, LLC, a/k/a ManorCare Health Services - King of Prussia; MANOR CARE OF KINGSTON PA, LLC, a/k/a ManorCare Health Services - Kingston; MANOR CARE - KINGSTON COURT OF YORK PA, LLC, a/k/a ManorCare Health Services - Kingston Court; MANOR CARE OF LANCASTER PA, LLC, a/k/a ManorCare Health Services - Lancaster; MANOR CARE LANSDALE OF MONTGOMERY PA, LLC, a/k/a ManorCare Health Services - Lansdale; MANOR CARE OF LAURELDALE PA, LLC, a/k/a ManorCare Health Services - Laureldale; MANOR CARE OF LEBANON PA, LLC, a/k/a ManorCare Health Services - Lebanon; MANOR CARE OF MCMURRAY PA, LLC, a/k/a ManorCare Health Services - McMurray; MANOR CARE OF MONROEVILLE PA, LLC, a/k/a ManorCare Health Services - Monroeville; MANOR CARE OF PLATTEVILLE WI, LLC; MANOR CARE OF SHAWANO (EAST) WI, LLC; MANOR CARE OF SHAWANO (WEST) WI, LLC; HCR MANORCARE,

    Defendants.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:09-cv-00013-CMH-TCB)

Argued: December 7, 2016                                      Decided: March 16, 2017

Before SHEDD, AGEE, and DIAZ, Circuit Judges.

Affirmed in part and vacated and remanded in part by published opinion. Judge Agee wrote the opinion, in which Judge Shedd and Judge Diaz joined.

**ARGUED:** William Louis Hurlock, MUELLER LAW LLC, Montclair, New Jersey, for Appellant. James Christopher Martin, REED SMITH LLP, Pittsburgh, Pennsylvania, for Appellees. **ON BRIEF:** Christopher P. Furlong, MUELLER LAW LLC, Montclair, New Jersey; L. Kendall Satterfield, Robert Wilson, Rosalee B.C. Thomas, FINKELSTEIN, THOMPSON LLP, Washington, D.C., for Appellant. Eric A. Dubelier, Katherine J. Seikaly, Washington, D.C., Colin E. Wrabley, M. Patrick Yingling, REED SMITH LLP, Pittsburgh, Pennsylvania, for Appellees.

AGEE, Circuit Judge:

Patrick Gerard Carson filed a qui tam suit on behalf of the United States and several states under the False Claims Act ("FCA") and the state equivalents, claiming that his employer, HCR Manor Care, and related companies, Manor Care, Inc. and Heartland Employment Services, LLC, (collectively, "Manor Care") were overbilling the respective governments for medical services. Carson included a separate claim of retaliation in his complaint, alleging that his employment was terminated after he notified his employer of the alleged overbilling. The district court dismissed the complaint in its entirety under the FCA's first-to-file rule. For the reasons below, we affirm in part and vacate and remand in part.

I.

In January 2009, Christine A. Ribik filed a qui tam suit under seal in the Eastern District of Virginia on behalf of the United States against Manor Care.[1] As a former occupational therapist for Manor Care's nursing facilities, Ribik alleged that she "witnessed therapists and other staff members commit numerous offenses in violation of Medicare regulations, which give rise to violations of the False Claims Act." J.A. 49. The complaint alleged that Manor Care inflated its revenues through overbilling Medicare for "skilled physical therapy and rehabilitation" costs. J.A. 52. Ribik claimed

---

[1] The plethora of companies in this case's caption, excluding those defined above as "Manor Care," and listed only as "defendants," were defendants only in Ribik's suit and thus not a part of this appeal.

8

that Manor Care regularly and fraudulently classified its patients as needing more physical therapy than necessary and instructed its physical therapists to spend more time than needed with the patients, resulting in higher Medicare payments. She also alleged that Manor Care sent some patients to physical or occupational therapy who did not need it at all and refused to discharge patients for whom physical therapy was no longer useful. Ribik amended her complaint in April 2011.

In September 2011, Carson filed a qui tam suit under seal in the Eastern District of Virginia on behalf of the United States and several individual states[2] against Manor Care under the FCA and the state-equivalent statutes. The suit sought

> to recover on behalf of the Government damages and civil penalties arising from false or fraudulent claims that Defendants submitted or caused to be submitted to federal Government-funded health insurance programs for skilled nursing facility stays and the therapies administered during those stays to Government-funded health insurance including, but not limited to, Medicare, Medicaid, TRICARE/CHAMPUS and FEHBP beneficiaries.

J.A. 132. Carson alleged that Manor Care had committed fraud upon the government through its billing practices, including "(a) Overbill[ing] for therapy services provided; (b) Bill[ing] for therapy services not provided; (c) Bill[ing] non-skilled activities as skilled therapy; and (d) Bill[ing] for unreasonable, unnecessary and at times harmful therapy." J.A. 132. The complaint also alleged that Manor Care spent more time than necessary with patients to increase billing and "postponed the discharge of patients for days and sometimes weeks longer than medically appropriate." J.A. 133. Carson

---

[2] The states include: California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Maryland, Michigan, Nevada, New Jersey, North Carolina, Oklahoma, Texas, Virginia, and Wisconsin.

claimed that he witnessed these practices while working for Manor Care's nursing facilities as a physical therapist assistant.

Carson also made a claim of retaliation under the FCA, alleging that his "employment with [Manor Care] was terminated in November of 2009 due to his repeated complaints about the fraudulent billing practices concerning patients associated with Government funded health programs including, but not limited to, Medicare and Medicaid." J.A. 163. The complaint stated that Carson informed management, human resources, and the corporate office of the "continued billing fraud" in February 2007 and multiple times in 2009, with a final complaint to Manor Care's corporate compliance office in November 2009. J.A. 164. He was fired less than a week later. Manor Care stated that Carson's employment "was terminated for changing a plan of care in violation of [state law]," given that "only a physical therapist may change a treatment goal within a plan of care." J.A. 164. Carson was not a licensed physical therapist. However, Carson claimed this reason was merely pretext, especially since "the goal changed by [Carson] was approved by the physical therapist, consistent with the practice utilized by [Manor Care]." J.A. 164.

Carson filed an amended complaint with twenty-five causes of action in May 2015; the only change from the original complaint was to remove certain defendants. Claims one through eight were qui tam claims under the FCA, including a conspiracy claim. The ninth was an FCA retaliation claim. The remaining causes of action were brought under the various state FCA-equivalent statutes.

10

Ribik and Carson's cases were consolidated in June 2012, and a third case[3] was added in November 2014. The United States Government filed a notice of election to intervene in the consolidated case in December 2014, and its "Consolidated Complaint in Intervention" was filed in April 2015. In July 2015, Manor Care filed a motion to dismiss the Government's complaint, arguing that the complaint failed to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and was improperly pleaded under Federal Rule of Civil Procedure 9(b). The district court denied the motion.

Manor Care then filed a motion to dismiss Carson's amended complaint. Among other arguments, Manor Care contended that the FCA and Michigan qui tam claims were barred by the first-to-file rule, and the FCA and all the state-equivalent qui tam claims, save the Wisconsin claim, were barred because they were based on public disclosure. Further, Manor Care argued that all claims failed because they were not "plausibly or sufficiently pleaded . . . pursuant to Rules 12(b)(6) and 9(b)." J.A. 563. The district court granted the motion in December 2015 in a three-page order, concluding that Carson's complaint was "based upon the same material elements of alleged fraud" as Ribik's complaint, and therefore the FCA's first-to-file rule barred all of Carson's claims. J.A. 638. The court dismissed Carson's complaint in its entirety for lack of subject matter jurisdiction. Carson filed a timely notice of appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

---

[3] This case was filed by Marie Slough in the Eastern District of Michigan on behalf of the United States in August 2010. The parties did not provide her complaint in the joint appendix. Because we find that Carson's complaint was preempted by Ribik's complaint, it is unnecessary to discuss Slough's complaint.

11

## II.

The Court reviews a dismissal for lack of subject matter jurisdiction and questions of statutory interpretation de novo. *Wu Tien Li-Shou v. United States*, 777 F.3d 175, 179 (4th Cir.), *cert. denied*, 136 S. Ct. 139 (2015) (subject matter jurisdiction); *Tankersley v. Almand*, 837 F.3d 390, 395 (4th Cir. 2016) (statutory interpretation). "We may affirm on any grounds supported by the record, notwithstanding the reasoning of the district court." *Tankersley*, 837 F.3d at 395.[4]

## III.

Carson's amended complaint alleged FCA qui tam claims, an FCA retaliation claim, and state fraud claims similar to an FCA qui tam claim. We address each in turn.

## A.

A private citizen may bring a civil action on behalf of the federal government for violation of the FCA. 31 U.S.C. § 3730(b). The FCA "encourag[es] citizens to act as whistleblowers, [while] also seek[ing] to prevent parasitic lawsuits based on previously disclosed fraud." *United States ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 181 (4th Cir. 2013), *aff'd in part, rev'd in part on other grounds sub nom. Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970 (2015). The Government may intervene in the action or allow the person filing the suit, called a relator, to proceed. 31 U.S.C. § 3730(b)(4). If the Government intervenes, the relator "shall have the right to

---

[4] We have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

continue as a party to the action." *Id.* § 3730(c)(1). Notably, "[w]hen a person brings an action under [the qui tam] subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." *Id.* § 3730(b)(5). The purpose of this restriction, known as the first-to-file rule, "is to provide incentives to relators to promptly alert the government to the essential facts of a fraudulent scheme," *United States ex rel. Wilson v. Bristol-Myers Squibb, Inc.*, 750 F.3d 111, 117 (1st Cir. 2014), while also keeping in mind the FCA's goal of maintaining the "balance between encouraging citizens to report fraud and stifling parasitic lawsuits," *United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999).

The Court applies the "material elements test" in determining whether a later-filed complaint is based on the facts underlying a previously-filed complaint. *Carter*, 710 F.3d at 182. The material elements tests bars a later suit "if it is based upon the same material elements of fraud as the earlier suit, even though the subsequent suit may incorporate somewhat different details." *Id.*; *see also Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1279 (10th Cir. 2004) (stating that the first-to-file rule applies when "a subsequent complaint raises the same or a related claim based in significant measure on the core fact or general conduct relied upon in the first qui tam action"). "[D]ifferences in specifics—such as geographic location or added facts—will not save a subsequent case." *Carter*, 710 F.3d at 181. A belated "relator who merely adds details to a previously exposed fraud does not help reduce fraud or return funds to the federal fisc, because once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." *United States ex rel. Branch Consultants*

13

*v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009). If a court finds that the particular action before it is barred by the first-to-file rule, the court lacks subject matter jurisdiction over the later-filed matter. *Carter*, 710 F.3d at 181. In that circumstance, the court must dismiss the action under Federal Rule of Civil Procedure 12(h)(3): "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

Carson argues that his "allegations go well beyond [Ribik's] allegations and include improper conduct that is wholly additional to anything contained in any previously filed complaints." Opening Br. 11. While he contends that the district court conducted only a "cursory review of the allegations generally," Opening Br. 12, our review is not cursory, yet we arrive at the same result. Indeed, Carson's claims are essentially the same as those found in Ribik's complaint. The shared contention of both complaints is that Manor Care implemented a scheme of overbilling for medical and physical therapy costs in order to defraud the Government. A comparison of the two complaints reveals how similar they are. *See United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 121 (D.C. Cir. 2015) ("Similarity is assessed by comparing the complaints side-by-side, and asking whether the later complaint alleges a fraudulent scheme the government already would be equipped to investigate based on the first complaint."). *Compare* J.A. 118–24 (Ribik's complaint), *with* J.A. 279–90 (Carson's complaint).

Ribik claimed that she "observed various fraudulent and improper practices related to billing and provision of Medicare related benefits." J.A. 119. Her complaint stated that Manor Care "classified various patients in high and ultra high RUG classifications,

14

even when their physical condition did not warrant the need for such extensive services." J.A. 119.[5] Ribik alleged that Manor Care "encouraged their physical therapy staff to maximize the number of minutes that they would spend with a patient during a reference period (the period of time used to determine a RUG level)," resulting in physical, occupational, and speech therapy continuing beyond what the patients needed. J.A. 119. She claimed that Manor Care "submitted billing to Medicare for patients who simply did not require skilled physical or occupational therapy" and "failed to discharge patients who were ready for discharge to outpatient services, so they could bill Medicare for skilled therapy that was no longer necessary." J.A. 120. The complaint stated that Ribik observed Manor Care employees "co-treating occupational therapy patients with a physical therapist, yet reporting the time separately to increase costs to Medicare." J.A. 121. Further, she alleged that Manor Care had practices of "billing treatment time even when patients were not engaged in treatment but were asleep, walking to treatment, toileting, or because of dementia, were actively resisting care," "falsely stating that treatments were performed when in fact a patient had not been given treatment," and "billing for services which were not medical [sic] necessary or appropriate for patients, including use of peg boards and pumpkin carving." J.A. 121–22. Also, Ribik claimed that Manor Care instructed its employees to "plac[e] patients, who could independently ambulate in excess of 150 feet and perform their acts of daily living in skilled therapy programs when they did not qualify for or require such services." J.A. 122. She

_____

[5] Patients covered by Medicare are classified into resource utilization groups, or RUGs, based on their treatment needs.

15

maintained that Manor Care employees "would pull patients from the general nursing home who were not eligible for physical therapy," particularly "individuals with advanced Alzheimer's disease or dementia," in order to bill for unneeded services. J.A. 123. Finally, Ribik alleged that Manor Care "encouraged and assented to these [illegal] activities by providing incentives and bonuses to those Directors at [Manor Care's] facilities who had the highest utilization rates." J.A. 124.

Much like Ribik, Carson claimed that Manor Care "utilized improper billing practices and methodologies to present or cause to be presented false claims to the Government for payments under the Government-funded health insurance programs." J.A. 279. He alleged that Manor Care instructed its staff to "indiscriminately shift minutes amongst the three therapy disciplines (physical, occupational and speech), to capture all prescribed minutes from patients from Government funded health programs," so that Manor Care's facilities "would not lose a high RUG category." J.A. 281. The Carson complaint also stated that Manor Care's employees would "often continue to treat patients who have already attained their treatment goals and/or patients whose treatment goals are clearly unattainable," that "[m]ost patients at the Facility who receive physical therapy also receive occupational therapy, regardless of medical need," and that Manor Care "often delay[ed] the discharge of patients from the Facility for days and sometimes weeks longer than medically necessary," all in order to increase billing. J.A. 285, 288. Carson alleged that "co-treatment sessions were double-billed" and that Manor Care employees "routinely bill[ed] for therapy that was refused by the patient and/or not even attempted by the Staff Member," made claims for patients "not actively engaged [in]

16

therapy," and billed for various non-skilled services and "activities designed to motivate and entertain the patients," such as "singing Christmas carols." J.A. 282–84. In addition, he maintained that Manor Care employees provided excessive therapy "to Alzheimer's patients and patients suffering from other forms of dementia." J.A. 285. Finally, Carson alleged that Manor Care employees were rewarded with "free lunch" for reaching a "corporate goal" of utilizing certain treatments. J.A. 286.

It is clear that Carson's allegations are materially similar to those found in Ribik's complaint. He attempts to distinguish his complaint by arguing that he is the sole relator to argue that Manor Care "improperly increased their billings to Government-funded health programs" by "consistently administering modalities like electric stimulation, diathermy, and ultra sound to inappropriate patients." Opening Br. 12. While Carson maintains that these "modalities" somehow constitute schemes different from those alleged in Ribik's complaint, those treatments fall under Ribik's general claim that Manor Care billed the Government for unnecessary treatment. The allegations in Ribik's earlier-filed complaint "provide the government with enough knowledge of essential facts of the scheme to discover related fraud." *See Carter*, 710 F.3d at 182. Neither Carson's factual additions nor the fact that his experience took place in Pennsylvania, as opposed to Ribik's experience in Virginia, saves him from the first-to-file bar. *See id.* at 181. Carson "has not managed to avoid § 3730(b)(5)'s first-to-file bar simply by alleging additional facts relating to *how* [Manor Care overbilled the Government], even though some of those specific allegations were not mentioned in [Ribik's] complaint." *See Grynberg*, 390 F.3d at 1280; *see also Branch Consultants*, 560 F.3d at 378 ("Any

17

construction of § 3730(b)(5) that focused on the details of the later-filed action would allow an infinite number of copycat qui tam actions to proceed so long as the relator in each case alleged one additional instance of the previously exposed fraud.").

Alternatively, and even assuming Carson's complaint contains substantially the same claims as Ribik's, he argues that his complaint should not be dismissed because the district court consolidated his claims with Ribik's. Because the Government intervened in the consolidated action, Carson argues that his claims survive application of the first-to-file bar. While a novel argument, it has no merit. The FCA does not make an exception to the first-to-file rule for consolidated complaints. The first-to-file rule is "an absolute, unambiguous exception-free rule." *Carter*, 710 F.3d at 181. The statute is clear: "[w]hen a person brings an action under this subsection, *no person other than the Government* may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5) (emphasis added). The statute does *not* read that "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action *unless that person's case is consolidated with the earlier-filed case*." Carson has not directed the Court to any authority supporting his unique position, which contravenes the plain language of the statute. *See United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 237 (3d Cir. 1998) (stating that "Merena filed his complaint before any of the other consolidated relators, and . . . § 3730(b)(5) therefore would bar any claims in the [other] complaints [consolidated with Merena's] that repeat Merena's allegations"); *see also United States ex rel. McLain v. Fluor Enters., Inc.*, Nos. 06-11229, 09-4191, 2014 WL 1796693 (E.D.

18

La. May 6, 2014) (dismissing individual claims after consolidation because of the first-to-file rule); *United States ex rel. Simpson v. Bayer Corp.*, No. 05-3895(JLL), 2012 WL 3600302 (D.N.J. Aug. 21, 2012) (same); *United States ex rel. Denenea v. Allstate Ins. Co.*, No. 07-2795, 2011 WL 231780 (E.D. La. Jan. 24, 2011) (same).   Carson's alternative argument fails under the plain language of the FCA.

Accordingly, the district court properly determined that it lacked subject matter jurisdiction over Carson's qui tam action under the FCA.[6]

---

[6] Carson also argues that the district court erred by refusing to allow him to amend his complaint upon dismissal.  We review the district court's decision to deny leave to amend for abuse of discretion. *See Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014).  Carson requested to amend the complaint only in his response to Manor Care's motion to dismiss. Despite being put on notice of the deficiencies in his complaint by Manor Care's motion, Carson only argued that "all of the Defendants' arguments, if viable, appear to be curable largely through scriveners' additions." J.A. 618.  He did not properly file a motion to amend under Federal Rule of Civil Procedure 15 or submit a proposed amended complaint.  Therefore, the district court did not abuse its discretion in denying leave to amend. *See Drager*, 741 F.3d at 474 (holding that, "[r]egardless of the merits of the desired amendment, a district court does not abuse its discretion by declining to grant a motion that was never properly made"); *see also Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130 (D.C. Cir. 2012) (holding that "a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)").

In regards to the merits, the district court did not explicitly address Carson's request. Ordinarily, "[w]hile the grant or denial of an opportunity to amend is within the discretion of the District Court, an outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *David v. Alphin*, 704 F.3d 327, 343 (4th Cir. 2013).  That said, "a district court's failure to articulate its reasons for denying leave to amend does not amount to an abuse of discretion so long as its reasons are apparent." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 194 (4th Cir. 2009).  Furthermore, "when a complaint is incurable through amendment, dismissal is properly rendered with prejudice and without leave to amend." *McLean v. United States*, 566 F.3d 391, 400 (4th Cir. 2009).  Carson made no proffer to the district court, nor to this Court, of how his complaint could be amended to overcome the first-to-file bar. *See Drager*, 741 F.3d at 474; *see also Rollins*, 703 F.3d at 131 (rejecting a similar argument by noting, in relevant part, that "on appeal [appellant] has not identified any alleged facts to cure the deficiencies in her complaint").  Thus, any amendment (Continued)

B.

While the foregoing resolves the jurisdictional issue as to the substantive FCA qui tam claims, Carson separately pleads a cause of action for retaliation in the termination of his employment. The FCA prohibits employers from retaliating against any employee "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). The district court dismissed Carson's retaliation claim on the same ground that it dismissed the FCA qui tam claims: the first-to-file rule. However, the first-to-file rule has no relation to a claim for retaliation.

We interpret a statute by looking to its text and structure. *See T-Mobile S., LLC v. City of Roswell*, 135 S. Ct. 808, 815 (2015) (analyzing the Telecommunications Act by focusing on "the statutory text and structure, and the concepts that Congress imported into the statutory framework"); *Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("When construing a statute, we start with its text."). A plain reading of the FCA reveals that the first-to-file rule is subsumed under, and therefore limited to, the "actions by private persons" provision of § 3730(b). By contrast, the retaliation action is contained within a separate subsection, § 3730(h), and is not tied back to subsection (b) or incorporated by reference. Application of the first-to-file rule is contained solely within the "actions by private persons" of § 3730(b) and thus only applies to claims

would be futile. *See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (stating that "a district court may deny leave if amending the complaint would be futile"). Carson's argument is without merit.

covered by that subsection. Under the plain language of the statute, § 3730(h) stands independently to subsection (b) and deals with an entirely different subject matter: retaliatory acts as opposed to false claims.

Considered from another perspective, assuming there is a sufficient basis to sustain an FCA fraud underlying a plaintiff's claims, those claims in effect belong to the Government. In contrast, the retaliatory claim is personal to the plaintiff, and the Government has no interest or right to that claim. *See Brooks v. United States*, 383 F.3d 521, 524–25 (6th Cir. 2004) (noting that § 3730(h) provides a cause of action for the recovery of "personal injury damages"); *see also Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (instructing that, for a retaliation claim, "a plaintiff must allege that (1) *he* engaged in protected activity, (2) the employer knew about the activity, and (3) the employer took adverse action against *him* as a result" (emphasis added)).

It would not make sense to allow only the person who wins the race to the courthouse on the qui tam claim to have a cause of action for retaliation rather than the victim of that retaliation. Because qui tam suits are initially filed under seal, plaintiffs are often unaware upon filing their suit that it may have been preempted by another suit. *See* 31 U.S.C. § 3730(b)(2) (requiring a qui tam complaint to "be filed in camera, [and] remain under seal for at least 60 days"). Application of the first-to-file rule to § 3730(h) claims would have the effect of causing plaintiffs to hesitate to report fraud to their employers and the Government because, if another suit has already been filed, they will not have any recourse for retaliatory actions by their employers. This is contrary to the purpose of the FCA to encourage private citizens to act as whistleblowers when they

21

suspect fraudulent Government claims. *See Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 349 (4th Cir. 2010) (stating that "[t]he purpose of the FCA is to prevent fraud against the United States" and "the purpose of its anti-retaliation provision is to protect those employees who take actions to uncover fraud"); *see also* S. Rep. No. 99-345, at 34 (1986) (recognizing that "few individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment, or any other form of retaliation" and therefore the FCA "seeks to halt companies and individuals from using the threat of economic retaliation to silence whistleblowers, as well as assure those who may be considering exposing fraud that they are legally protected from retaliatory acts").

To its credit, Manor Care does not defend the district court's decision to dismiss Carson's retaliation claim under the first-to-file rule. Rather, Manor Care argues that we should affirm the trial court's decision on other grounds. We decline to consider those other grounds as they were never addressed by the district court, which should have that opportunity in the first instance. Therefore, we vacate the district court's dismissal of Carson's FCA retaliation claim and remand for further proceedings. In doing so, we express no view on the merits of the other grounds raised by Manor Care regarding Carson's retaliation claim.

## C.

Finally, the district court also dismissed the state fraud claims on the basis of the federal first-to-file rule. The district court did not support its decision with any discussion or authority to establish that any of the states apply the FCA first-to-file rule, or its equivalent, to that state's statute. As with the FCA retaliation claim, Manor Care

22

does not attempt to defend the district court's dismissal of the state claims pursuant to the federal first-to-file rule.[7]  Rather, Manor Care offers alternative grounds for affirming the district court.  Again, we decline to consider those grounds on appeal as they were not addressed by the district court, which should have that opportunity in the first instance, and we express no view on the merits of those arguments.  Therefore, we vacate the district court's judgment as to the state claims and remand those claims to the district court for further proceedings.[8]

## IV.

We therefore affirm the district court's dismissal of Carson's qui tam action under the FCA for lack of subject matter jurisdiction, but vacate and remand that part of the judgment concerning Carson's retaliation and state fraud claims.

*AFFIRMED IN PART AND*
*VACATED AND REMANDED IN PART*

---

[7] Manor Care does argue that Michigan has a first-to-file bar that operates analogously to the federal rule.  Because the district court did not address this argument, we decline to affirm the dismissal of the Michigan claim based on this alternative ground, which can be considered by the district court in the first instance upon remand.

[8] Because we remand the FCA retaliation claim, the district court may continue to exercise supplemental jurisdiction over the state claims as it so determines in its discretion.  *See* 28 U.S.C. § 1367.

23